**SECURITIES AND EXCHANGE COMMISSION, Plaintiff**

and

**National Association of Securities Dealers, Inc., Intervenor-Plaintiff**

v.

**THE VARIABLE ANNUITY LIFE INSURANCE COMPANY OF AMERICA, Defendant**

**The Equity Annuity Life Insurance Company, Intervenor-Defendant.**

**Civ. No. 2549–56.**

United States District Court
District of Columbia.

Sept. 3, 1957.

Thomas G. Meeker, General Counsel for SEC, Washington, D. C., Daniel J. McCauley, Assoc. Gen. Counsel, Philadelphia, Pa., Myer Feldman, New York City, Special Counsel for SEC, Pace Reich, Philadelphia, Pa., for plaintiff Securities and Exchange Commission.

John H. Dorsey, Bolling R. Powell, John W. Lindsey, Blum, Lindsey & Powell, Washington, D. C., for intervenor-plaintiff.

James M. Earnest and George R. Jacóbi, Washington, D. C., Roy W. Mc-Donald, Donovan Leisure, Newton & Irvine, New York City, for defendant The Variable Annuity Life Ins. Co. of America.

Brookhart, Becker & Dorsey, Benjamin H. Dorsey, Washington, D. C., for defendant-Intervenor The Equity Annuity Life Ins. Co.

WILKIN, District Judge.

This case came on for trial and was submitted on the pleadings, stipulations, evidence and briefs. Jurisdiction is based on 15 U.S.C.A. § 77a et seq., and § 80a–1 et seq. The defendants are chartered life insurance companies in the District of Columbia. The Equity Annuity Life Insurance Company, on its own motion, was made an intervenor-defendant. The National Association of Securities Dealers, Inc., (organized under 15 U.S.C.A. § 78o–3 et seq.) on its motion, was made an intervenor-plaintiff.

Throughout the trial, the plaintiff was referred to as "SEC", and the intervenor-plaintiff was referred to as "NASD". The defendant was referred to as "VALIC", and the intervenor-defendant was referred to as "EALIC".

The Complaint prays for a preliminary and final injunction restraining VALIC from selling or offering for sale certain contracts denominated "variable annuity" contracts or policies, unless and until they are registered with SEC in accordance with the provisions of the Se-

curities Act of 1933, and the Company complies with the provisions of the Investment Company Act of 1940.

It is the contention of the plaintiff that the very nature, and the express provisions, of the variable annuity contracts make the companies and the contracts amenable to the enactments of Congress and the regulations of SEC with reference to the sale of securities or interests in securities.

The defendants oppose that contention and insist that they are insurance companies, that the variable annuity contracts which they issue are insurance policies, that the defendant companies are licensed and regulated by the District Insurance Superintendent and the State Insurance Commissioners where they operate, and that they are expressly exempt from the jurisdiction of the Federal agency established for the regulation of the sale of securities.

The defendants further assert that the McCarran-Ferguson Insurance Regulation Act (Act, March 9, 1945, 59 Stat. 33, as amended, Act, July 25, 1947, c. 326, 61 Stat. 448, 15 U.S.C.A. §§ 1011–1015) gives the State and District authorities exclusive jurisdiction over them and their business.

The issue in the case is,—Are the defendants and their equity or variable annuity contracts subject to the State and District laws exclusively, or are they subject to the Federal regulations as administered by the SEC, or are they subject to both State and Federal regulations? That issue must be determined first by a consideration of the contracts. Are such contracts insurance policies, or are they securities evidencing investments or interests in investments?

The evidence in this case makes it clear to this Court that they cannot be classified as either, exclusively. The variable annuity contracts contain provisions which must be classified as insurance, and also provisions which bring them within the statutory definition of securities.

The contracts issued by the defendants differ in certain details. The amount and terms of payment are different; some contracts include decreasing term life insurance, others do not; some, but not all, include a waiver of further payments to the company in case of the permanent and total disability of the holder of the contract.

The essential characteristic of all the contracts, and the characteristic which gives rise to this litigation, is found in the provisions which create a reserve fund of the amounts paid by contract holders for the purpose of investing it mainly in common stocks under the management of the company, and from which annuity and other payments due to contract holders shall be made in amounts determined by the investment experience, i. e., profits and losses of the fund.

Plaintiff's Exhibit No. 1, entitled "Deferred Variable Annuity Policy", was received in evidence as a specimen of all the contracts that employ such investment practice (Appendix 1). It was issued and sold by VALIC. For purposes of clarity and convenience, it and VALIC will be referred to with the understanding that what is said applies to all similar contracts and the companies issuing them.[1]

The contract provides for two periods: (1) the accumulation or pay-in period, and (2) the annuity or withdrawal period. During the first period, the contract holder makes "premium" payments for which he receives an equitable interest in VALIC's investment fund, and for which VALIC credits him with a number of "accumulation units". The number of units is determined by dividing the amount of the payment by the value of one accumulation unit as of the last day of the month in which the payment is received. The value of one unit is, of course, determined by dividing the amount of the fund (market value of

---

1. EALIC stipulated that its contracts were in all material respects the same as those issued by VALIC.

stock) by the number of accumulation units issued against it. The amount paid by the contract holder is subject to a deduction for management expense and the cost (premiums) of decreasing term life insurance and total permanent disability insurance, and the remainder is then applied to the purchase of accumulation units.

The variable annuity period (2) is the term during which VALIC makes variable annuity payments, according to the terms of the contract, to the contract holder who has elected to participate in the plan. The contract holder is credited with a sum of money determined by multiplying the number of accumulation units credited to his account by the value of one unit as of that time. The first annuity payment is computed on the sum so credited by using the Progressive Annuity Table with a rate of interest of 3½ per cent per annum, in the same way that any life insurance company would compute it. VALIC then credits the contract holder with a number of annuity units, the number being determined by dividing the amount of the first payment by the value of a unit. The number of units then remains constant for the term of the contract, but the value of an annuity unit varies thereafter according to VALIC's investment experience. And subsequent variable annuity payments are computed by multiplying number of units by the value of a unit at time of payment.

This analysis of the variable annuity shows that, while the contract has certain definite features of insurance, it has a marked difference from the conventional insurance contract. Whereas the money paid for conventional insurance becomes the absolute property of the insurance company, the money paid for a variable annuity goes into an investment fund which becomes, by operation of law if not by express terms of the contract, a trust fund for the equitable interests of the contract holders. And, whereas the conventional insurance policy obligates the insurance company to pay the policy holder a definite fixed amount at specified times, the variable annuity contract obligates the company issuing it to pay at stipulated times, not fixed dollar amounts, but only such amounts as are warranted by the investment experience of the company managing the fund.

The evidence was clear and undisputed that the variable annuity contract was devised for the very purpose of providing contract holders with payments adjusted to the fluctuating purchasing power of the dollar. The evidence revealed that the value of the dollar (measured by purchasing power) had declined about 70% in the last 70 years, and that holders of policies and securities yielding a fixed-dollar return were deprived of the security which they had expected. The variable annuity contract was based on the economic theory (questioned by some economists) that common stocks tend to fluctuate in value with business conditions, and to rise generally with price levels and the cost of living. It was, therefore, deemed advisable by some insurance companies to abandon the traditional practice of investing in debt securities which provide certain, but fixed, interest rates, and create instead a reserve fund segregated from other company assets, invested in diversified stocks, and offer to their annuitants an undivided interest in such fund, evidenced by annuity units, the value of which fluctuates with the rise and fall of common stock prices.

It seems clear to this Court that such an arrangement would, if the fund is well managed, tend to increase payments due to annuitants in general, in accordance with the rise in the cost of living at times of inflation. But contract holders whose annuity payments came due at a time of severe economic depression would realize that they had no insurance against the fate of stock, "securities" or "investments", that fail with the decline or collapse of the stock market. While the contract would provide a kind of hedge against the effect of inflation, it would give no insurance against the effect of depression.

Extensive testimony was offered at trial as to the nature and practices of

insurance business and of investment business for the purpose of incorporating in the record a basis for arguments regarding analogies and differences. Actuaries, economists, insurance specialists and publicists, and executive officers of insurance companies, investment companies and the New York Stock Exchange, were called as witnesses. The evidence was generally instructive and interesting, and revealed the great public interest in the issue of the case, but it need not be reviewed in this opinion because life insurance, life annuity and investment trust concepts, functions and contracts are generally understood, and, as stated at trial, the controlling facts are largely undisputed.

For that reason, the real issue must be determined by the law, and the controlling law is found in the applicable statutes. The plaintiffs contend that the variable annuity contract is a "security" as defined by the Securities Act of 1933, and cite Sec. 2(1), 15 U.S.C.A. § 77b (1):

"The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, pre-organization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

And plaintiffs contend that each of the defendants is an investment company as defined in the Investment Company Act and cite Sec. 3(a), 15 U.S.C.A. § 80a–3:

"Sec. 3(a) When used in this title, 'investment company' means any issuer which—

"(1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities;

\* \* \* \* \* \*

"(3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."

The defendants contend that their annuity contracts are exempt from the provisions of the Securities Act and cite Secs. 3(a) and (8), 15 U.S.C.A. § 77c:

"Sec. 3. (a) Except as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities:

\* \* \* \* \* \*

"(8) Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia;"

And defendants contend that they are not Investment Companies and quote as follows from Sec. 3 and Sec. 2 of that Act, 15 U.S.C.A. §§ 80a–3, 80a–2:

"(c) Notwithstanding subsections (a) and (b), none of the following persons is an investment company within the meaning of this title:

"(3) Any bank or insurance company; \* \* \*."

Sec. 2

"(a) When used in this title, unless the context otherwise requires —\* \* \*

"(17) 'Insurance company' means a company which is organized as an

insurance company, whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies, and which is subject to supervision by the insurance commissioner or a similar official or agency of a State; * *."

And defendants further rely on the contention that the McCarran Act, 15 U.S.C.A. § 1011, vests exclusive regulatory jurisdiction over them in the Insurance Superintendent of the District of Columbia and the Insurance Commissioners of the several states where they are authorized to do business, and cite the following material parts of that Act:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

"Sec. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after January 1, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended,

shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

\* \* \* \* \* \*

"Sec. 5. As used in this Act, the term 'State' includes the several States, Alaska, Hawaii, Puerto Rico, [Guam] and the District of Columbia."

The logic of the law applied to the established facts seems to bring the variable annuity contract within the purpose and intendment of the Securities Act, and the defendants within the terms and plan of the Investment Company Act. This Court would feel constrained to so hold if it were not for the clear and explicit language of the McCarran Act and the fact that the defendants are licensed and regulated by the insurance departments of this District and the States where they operate.

Because the variable annuities were not in existence or general use when the statutes mentioned were enacted, there is no definite expression of Congressional intention or opinion regarding them. When, however, the defendants produced and put into use a contract which abandoned the provisions of conventional insurance policies with fixed-dollar benefits, guaranteed by the company, and created a reserve fund for investment mainly in common stocks, with provision for payment of annuity benefits subject to gains and losses of the fund, they created a hybrid policy-contract with characteristics of both its insurance and its investment progenitors.

It was natural, then, for the officers of SEC to question whether this novel contract should be classified as insurance for an annuity, or as a security for an investment, and by what authority it should be regulated. As stated, if the companies issuing the novel contract were not chartered, licensed and regulated by District and State authorities, and if Congress had not passed the McCarran Act, the questions raised by SEC would

be answered by applying the rules of statutory construction to the Securities Act of 1933 and the Investment Company Act of 1940, and, in the opinion of this Court, such construction would bring the defendants within the purview and purpose of those statutes.

■ When, however, the Congress passed the McCarran Act and set at naught the decision of the Supreme Court in the case of United States v. South-Eastern Underwriters Association, 1944, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, it excluded all Federal agencies from regulatory jurisdiction over all insurance companies and insurance business except such agencies as it then excepted or might in the future except. SEC has not been made an exception.

In view of the fact that the defendants have been chartered as insurance companies by the District of Columbia and their questioned contracts have been approved by the Insurance Superintendent of the District, and by the insurance departments of certain states, this Court is constrained to hold that the broad, explicit and impelling language of the Mc-Carran Act makes them exempt from Federal regulation unless and until Congress provides otherwise.

The arguments which plaintiffs advance here should be made to the Congress. The Supreme Court has recognized that it was the intention of Congress to give support to the existing and future State systems for regulating the business of insurance "by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation". Prudential Insurance Co. v. Benjamin, 1946, 328 U.S. 408, 430, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342.

The plaintiffs base their complaint on the contention that the contracts issued by defendants are securities evidencing investments and, therefore, not within the exemptions granted to insurance policies, regardless of what the defendants and their contracts are called. The defendants base their defense on the contention that they are duly chartered insurance companies, that the contracts they issue are insurance policies, and that, therefore, they and their contracts are not subject to the Securities Act, the Investment Company Act, the regulations of SEC, and are under the full protection of the McCarran Act. This Court cannot sustain or overrule either contention, entirely. The contract is novel and will not fit exactly into either of the categories suggested. The judgment of the Court is, therefore, what in ring-side parlance would be called a "split decision". The contract in issue is like a horse on the range that has not been branded or corralled. In view of the language of the McCarran Act, it seems to this Court that Congress should do the branding. If the question should be asked: "Why Congress?", the answer would be: "It asked for it."

■ The legislative history of the McCarran Act, as well as its language, shows clearly that its purpose was to keep control of insurance business in the States. As one Senator said, "We want the business left in the control of the States, unless, by enactment in the future, we specifically state that we do not want something they are doing to be continued". (Hearings p. 159)

The plaintiffs contend that the defendants, with the approval of some District and State insurance officials, placed themselves in the insurance field, but that the business which they are doing does not warrant their continuance in that field. The Congress, however, has barred all Federal agencies from access to that field, except those specifically named, and SEC has not been named. The broad and exclusive effect of the McCarran Act has been sustained by the Supreme Court and by the Courts of Appeal. Maryland Casualty Co. v. Cushing, 1954, 347 U.S. 409, 413, 74 S.Ct. 608, 98 L.Ed. 806; American Hospital & Life Insurance Company v. Federal Trade Commission, 5 Cir., 1957, 243 F.2d 719; National Casualty Co. v.

Federal Trade Commission, 6 Cir., 1957, 245 F.2d 883.

The McCarran Act is not the only reason for Congressional action. The definitive classification of variable annuities will involve the consideration of broad principles of public policy, the effect of such classification on the insurance business and on the investment business, and on the balance of powers between State and Federal agencies,— all of which are matters that generally lie within the province of the legislative function. This Court may be considered old-fashioned, but it still looks upon our Constitutional separation of powers with great respect, and views with apprehension the usurpation of the powers of one branch of government by any other.

At trial, parties, counsel and Court seemed to recognize that there were issues involved in this controversy which would have to be determined by Congress, no matter what decision in this case was made by this or any other court—that Congress might have to provide for new rules and regulations covering variable annuities. It was also recognized that there is urgent need for a prompt solution of the entire problem. If the trial and decision of this case is not conclusive of the issue, it is reasonable to hope that it may be conducive to a determination. In any event, a legal analysis had to be made and the conflicting interests had to be heard. The record of this case, including the transcript of testimony, exhibits and excellent briefs of able and experienced counsel, should be of great service.

■ The motion of NASD for leave to intervene should be, and is, sustained. It is apparent that its business may be affected by this case. The essence of the intervenor-plaintiff's contention is that all dealers in securities should be subject to the same regulations. It contends that a company which buys and holds securities for its own account, and issues annuity policies calling for payments in fixed-dollar amounts, is an insurance company, but that a company which buys and holds securities for the account of others, and issues to its customers grants of participation rights or interests in such securities, subject to profits and losses, is a securities dealer.

Reverting again to the simile of the range horse, an attractive new creature has been discovered on the financial range. It has some of the markings of the insurance herd and also some of the markings of the investment herd, but it has not been branded. It has sought shelter in the insurance corral. But the security dealers say it should be in the investment corral. The contending parties appeal to this Court to brand the creature for proper classification. This Court, however, finds that Congress has kept the only branding iron. It seems clear to this Court, therefore, that Congress should determine whether the creature should be branded INS or INV (Insurance or Investment), or whether it should have some other brand, such as INSV, and whether it should be placed in one or the other corral, or have a new corral of its own. Congress, it seems, is the proper agency to determine what classification would best enable the creature to serve the national economy.

■ In spite of the fact that the variable annuity applies the annuity principle directly to a new area of investment, common stocks, and pays to the annuitant, not fixed-dollar amounts, but amounts determined by investment experience, still the contract is denominated an annuity policy, and the companies selling variable annuities are chartered as life insurance companies. In view of the language and history of the McCarran Act, such contracts and companies are subject only to the regulations of the insurance departments of the District of Columbia and the States where such companies are licensed to do business. It is the judgment of this Court that Congress only can make such contracts and companies amenable to the regulations of SEC.

Judgment for defendants. Complaint dismissed.

**Policy Number:**
Specimen

**Date of Birth:**
10-1-1921

**Sex:**
Male

## *Variable Annuity Life Insurance Company*

**THE MONTHLY INCOME** — Agrees to pay at its Home Office a variable life annuity consisting of a series of variable monthly installments

As set forth in the **Benefits Payable To The Annuitant Provisions** commencing on

**MATURITY DATE** — November 1, 1986          to

**THE ANNUITANT** — John Doe          if then living, and subsequent monthly installments on the same day of each month thereafter until 120 monthly installments, including the first, shall have been paid, and so long thereafter as the Annuitant may live, or in lieu of such monthly installments, the Annuitant may within 30 days prior to The Maturity Date, elect any other option as set forth in the **Benefits Payable To The Annuitant Provisions**; or upon receipt at the Home Office of the due proof of the interest of claimant and that the death of the Annuitant has occurred prior to The Maturity Date, the Company will pay

**THE DEATH BENEFIT** — the following amounts of life insurance in addition to the amount of the cash value of this policy determined in accordance with **Provision 14**

### Schedule of Life Insurance

| Policy Year | Amount | Policy Year | Amount | Policy Year | Amount |
|---|---|---|---|---|---|
| 1 | $4,800.00 | 8 | 0 | 16 | 0 |
| 2 | 3,840.00 | 9 | 0 | 17 | 0 |
| 3 | 2,880.00 | 10 | 0 | 18 | 0 |
| 4 | 1,920.00 | 11 | 0 | 19 | 0 |
| 5 | 960.00 | 12 | 0 | 20 | 0 |
| 6 | 0 | 13 | 0 | 21 | 0 |
| 7 | 0 | 14 | 0 | and | 0 |
|  |  | 15 | 0 | thereafter | 0 |

to

**THE BENEFICIARY** Mary Doe

Any indebtedness to the Company secured by this policy will be deducted in any settlement hereunder.

**OPTIONAL DATES FOR MATURITY** — The Annuitant may elect to change the date of commencement of the annuity installments in the manner provided in **Provision 5 (d)** hereof.

**PREMIUMS** — This policy is issued in consideration of the Payment of $1,000.00 (of which $960.40 is the Basic Annuity Premium) the receipt of which is hereby acknowledged and, unless this be a single premium policy, there shall be due and payable a like sum to the Company on or before the 1st day of every November each year until premiums for 30 full years from the date of issue hereof shall have been paid or until the prior death of the Annuitant, except that the amount of premium payable on or after        shall be $   .

This policy is issued and accepted subject to all the conditions and provisions set forth on the subsequent pages hereof, which are hereby made a part of this contract.

In Witness Whereof, the Variable Annuity Life Insurance Company has caused this policy to be executed at its Home Office in Washington, D. C. this 1st day of November, 1956, which is the date of issue of this policy.

Countersigned          Specimen          ROBERT A. CRICHTON
                        *Registrar*             *President*

Variable Life Annuity Benefits Payable Commencing at a Time between Age 50 and 70, Selected by the Annuitant. Life Insurance Benefits if provided in Schedule of Insurance. Benefits for Disability if provided by Rider. Premiums Payable Until Maturity Date, or by Single Payment.

**ANNUITY PAYMENTS PROVIDED BY THIS POLICY ARE VARIABLE
AND ARE NOT GUARANTEED AS TO FIXED DOLLAR AMOUNT**

**"DEFERRED VARIABLE ANNUITY POLICY"**

## GENERAL PROVISIONS

**1. PREMIUM PAYMENTS** — Premiums are due and payable in advance at the Home Office of the Company but may be paid to an authorized agent of the Company in exchange for the Company's receipt therefor signed by the President or the Secretary and countersigned by the agent as evidence of such payments. Premiums may be paid annually, semi-annually, quarterly or monthly, at the rates in use by the Company at the date of issue hereof. The mode of premium payment may be changed on any policy anniversary. The payment of any premium shall not continue this policy in force beyond the date when the next premium is due and payable, except as otherwise provided herein.

**2. GRACE PERIOD** — Any premium not paid on or before the date it falls due is in default, but a grace period of 31 days, without interest, will be allowed for the payment of every premium after the first, during which period this policy shall continue in force. If death occurs within the grace period, any premium then due and unpaid shall be deducted from the amount otherwise payable hereunder, which shall be determined as though such premium had in fact been paid when due.

**3. REINSTATEMENT** — This policy, unless surrendered for its cash value or unless annuity benefit payments have commenced, may be reinstated at any time within three years after date of default in payment of premium, upon presentation of evidence of insurability satisfactory to the Company, the payment or reinstatement of any indebtedness at date of default, the payment of all premiums in arrears and the payment of interest on such indebtedness and on all unpaid premiums at the rate of 3% per annum. The payment of all past due premiums will be applied in accordance with the table under **Provision 4** at the accumulation unit value as of the last day of the calendar month in which paid.

**4. ACCUMULATION UNITS FROM PREMIUM PAYMENTS** — (a) The percentages of Basic Annuity Premium shown in the following table, hereby defined as the net premium, will be applied as of the last day of the calendar month in which the total premium is paid, to provide accumulation units on the basis of the then current value of such units as specified in (b) of this provision.

Percentage of Basic Annuity Premium Applied to
Provide Accumulation Units

| Policy Year Basic Annuity Premium Due | Percentage | Policy Year Basic Annuity Premium Due | Percentage |
|---|---|---|---|
| 1st | 44.79 | 5th | 87.17 |
| 2nd | 85.27 | 6th through 10th | 89.00 |
| 3rd | 85.82 | 11th year and after | 92.00 |
| 4th | 86.45 | | |

(b) The number of accumulation units credited by any such application under (a) above, shall be determined by dividing the number of dollars so applied by the dollar value of one accumulation unit, as defined in the **Valuation Provisions.** The number of accumulation units so determined shall not be affected by any subsequent change in the dollar value of one accumulation unit. The dollar value of an accumulation unit may vary from month to month as set forth in the **Valuation Provisions.**

(c) The Company will notify the Annuitant at least once in each calendar year, of the total number of accumulation units in force under this policy and the dollar value of such a unit.

### BENEFITS PAYABLE TO THE ANNUITANT PROVISIONS

**5. ANNUITY OPTIONS** — (a) *Alternative Selection:* In lieu of the life annuity payments with a minimum of 120 monthly installments prescribed on the face of the policy (being Option B hereunder) the Annuitant may elect to receive payments in accordance with Options A, or C as set forth in the following tables:

(b) *Description of Options:*

OPTION A — *Straight Life Annuity* — An annuity payable in monthly installments during the lifetime of the payee and ceasing with the last payment due prior to the death of the payee.

Dollar Amount of First Monthly Installment Payable for Each
$1,000 of Value of Accumulation Units Applied

| Age of Payee | Male | Female | Age of Payee | Male | Female | Age of Payee | Male | Female |
|---|---|---|---|---|---|---|---|---|
| 50 | $4.60 | $4.28 | 57 | $5.37 | $4.89 | 64 | $6.59 | $5.83 |
| 51 | 4.69 | 4.36 | 58 | 5.52 | 5.00 | 65 | 6.81 | 6.00 |
| 52 | 4.79 | 4.43 | 59 | 5.67 | 5.12 | 66 | 7.06 | 6.18 |
| 53 | 4.89 | 4.51 | 60 | 5.83 | 5.24 | 67 | 7.32 | 6.38 |
| 54 | 5.00 | 4.60 | 61 | 6.00 | 5.37 | 68 | 7.60 | 6.59 |
| 55 | 5.12 | 4.69 | 62 | 6.18 | 5.52 | 69 | 7.90 | 6.81 |
| 56 | 5.24 | 4.79 | 63 | 6.38 | 5.67 | 70 | 8.22 | 7.06 |

**OPTION B** — *Life Annuity with 120 Monthly Installments Guaranteed* — An annuity payable monthly during the lifetime of the payee with a guarantee that if, at the death of the payee, installment payments have been made for less than 10 years, the annuity payments will be continued to the Beneficiary during the remainder of the 10 year period or, if elected, the then present value of the current dollar amount of the annuity payments, commuted on the basis of 3½% interest compounded annually for such remainder of the 10 year period, shall be paid in a lump sum. If any Beneficiary dies while receiving annuity payments, the then present value of the current dollar amount of such annuity payments, commuted on the basis of 3½% interest compounded annually, for such remainder of the 10 year period, shall be paid in a lump sum to the estate of the Beneficiary.

### Dollar Amount of First Monthly Installment Payable for Each $1,000 of Value of Accumulation Units Applied

| Age of Payee | Male | Female | Age of Payee | Male | Female | Age of Payee | Male | Female |
|---|---|---|---|---|---|---|---|---|
| 50 | $4.55 | $4.26 | 57 | $5.24 | $4.82 | 64 | $6.21 | $5.62 |
| 51 | 4.64 | 4.32 | 58 | 5.36 | 4.92 | 65 | 6.37 | 5.76 |
| 52 | 4.73 | 4.40 | 59 | 5.49 | 5.02 | 66 | 6.53 | 5.90 |
| 53 | 4.82 | 4.47 | 60 | 5.62 | 5.13 | 67 | 6.71 | 6.05 |
| 54 | 4.92 | 4.55 | 61 | 5.76 | 5.24 | 68 | 6.89 | 6.21 |
| 55 | 5.02 | 4.64 | 62 | 5.90 | 5.36 | 69 | 7.07 | 6.37 |
| 56 | 5.13 | 4.73 | 63 | 6.05 | 5.49 | 70 | 7.25 | 6.53 |

**OPTION C** — *Joint and Last Survivor Life Annuity* — An annuity payable monthly during the joint lifetime of the primary payee and another person, herein called the secondary payee, and during the survivor's remaining lifetime.

### Dollar Amount of First Monthly Installment Payable for Each $1,000 of Value of Accumulation Units Applied

| Male | Female | 50 / 54 | 51 / 55 | 52 / 56 | 53 / 57 | 54 / 58 | 55 / 59 | 56 / 60 | 57 / 61 | 58 / 62 | 59 / 63 | 60 / 64 | 61 / 65 | 62 / 66 | 63 / 67 | 64 / 68 | 65 / 69 | 66 / 70 | 67 / 71 | 68 / 72 | 69 / 73 | 70 / 74 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | 39 | 3.59 | 3.60 | 3.61 | 3.61 | 3.62 | 3.63 | 3.63 | 3.64 | 3.65 | | | | | | | | | | | | |
| 36 | 40 | 3.62 | 3.63 | 3.64 | 3.64 | 3.65 | 3.66 | 3.66 | 3.67 | 3.68 | 3.68 | 3.69 | | | | | | | | | | |
| 37 | 41 | 3.65 | 3.66 | 3.67 | 3.68 | 3.68 | 3.69 | 3.70 | 3.70 | 3.71 | 3.72 | 3.72 | 3.73 | | | | | | | | | |
| 38 | 42 | 3.68 | 3.69 | 3.70 | 3.71 | 3.72 | 3.73 | 3.73 | 3.73 | 3.74 | 3.75 | 3.75 | 3.76 | 3.77 | 3.77 | | | | | | | |
| 39 | 43 | 3.71 | 3.72 | 3.73 | 3.74 | 3.75 | 3.76 | 3.77 | 3.78 | 3.78 | 3.79 | 3.80 | 3.80 | 3.81 | 3.82 | | | | | | | |
| 40 | 44 | 3.74 | 3.75 | 3.76 | 3.77 | 3.79 | 3.80 | 3.81 | 3.81 | 3.82 | 3.83 | 3.84 | 3.85 | 3.85 | 3.86 | 3.86 | | | | | | |
| 41 | 45 | 3.77 | 3.78 | 3.80 | 3.81 | 3.82 | 3.83 | 3.84 | 3.85 | 3.86 | 3.87 | 3.88 | 3.89 | 3.90 | 3.90 | 3.91 | 3.92 | | | | | |
| 42 | 46 | 3.80 | 3.82 | 3.83 | 3.84 | 3.86 | 3.87 | 3.88 | 3.89 | 3.90 | 3.91 | 3.92 | 3.93 | 3.94 | 3.95 | 3 96 | 3.96 | 3.97 | | | | |
| 43 | 47 | 3.83 | 3.85 | 3.86 | 3.88 | 3.89 | 3.91 | 3.92 | 3.93 | 3.95 | 3.96 | 3.97 | 3.98 | 3.99 | 4.00 | 4.00 | 4.01 | 4.02 | 4 03 | | | |
| 44 | 48 | 3.86 | 3.88 | 3.90 | 3.92 | 3.93 | 3.95 | 3.96 | 3.98 | 3.99 | 4.00 | 4.01 | 4.03 | 4.04 | 4.05 | 4.05 | 4.06 | 4.07 | 4 08 | 4.09 | | |
| 45 | 49 | 3.89 | 3.91 | 3.93 | 3.95 | 3.97 | 3.99 | 4.00 | 4.02 | 4.03 | 4.05 | 4.06 | 4.07 | 4.09 | 4.10 | 4.11 | 4.12 | 4.12 | 4.13 | 4.14 | 4.15 | |
| 46 | 50 | 3.92 | 3.95 | 3.97 | 3.99 | 4.01 | 4.03 | 4.05 | 4.06 | 4.08 | 4.09 | 4.11 | 4.12 | 4.14 | 4.15 | 4.16 | 4.17 | 4.18 | 4.19 | 4.20 | 4.21 | 4.22 |
| 47 | 51 | 3.96 | 3.98 | 4.00 | 4.03 | 4.05 | 4.07 | 4.09 | 4.11 | 4.13 | 4.14 | 4.16 | 4.18 | 4.19 | 4.20 | 4.22 | 4.23 | 4.24 | 4.25 | 4.26 | 4.27 | 4.28 |
| 48 | 52 | 3.99 | 4.01 | 4.04 | 4.06 | 4.09 | 4.11 | 4.13 | 4.15 | 4.17 | 4.19 | 4.21 | 4.23 | 4 24 | 4.26 | 4 28 | 4 29 | 4.30 | 4 31 | 4.32 | 4.33 | 4.34 |
| 49 | 53 | 4.02 | 4.05 | 4.07 | 4.10 | 4.13 | 4.15 | 4.17 | 4.20 | 4.22 | 4.24 | 4.26 | 4.28 | 4.30 | 4.32 | 4.33 | 4.35 | 4.36 | 4.38 | 4.39 | 4.40 | 4.41 |
| 50 | 54 | 4.05 | 4.08 | 4.11 | 4.14 | 4.17 | 4.19 | 4.22 | 4.24 | 4.27 | 4.29 | 4.32 | 4.34 | 4.36 | 4.38 | 4.40 | 4.41 | 4.43 | 4.45 | 4.46 | 4.47 | 4 49 |
| 51 | 55 | 4.08 | 4.11 | 4.14 | 4.17 | 4.20 | 4.23 | 4.26 | 4.29 | 4.32 | 4.35 | 4.37 | 4.40 | 4.42 | 4.44 | 4.46 | 4.48 | 4.50 | 4.52 | 4.53 | 4 55 | 4 56 |
| 52 | 56 | 4.11 | 4.14 | 4.18 | 4.21 | 4.24 | 4.28 | 4.31 | 4.34 | 4.37 | 4.40 | 4.43 | 4.45 | 4.48 | 4.50 | 4.53 | 4.55 | 4.57 | 4.59 | 4.61 | 4.62 | 4.64 |
| 53 | 57 | 4.14 | 4.17 | 4.21 | 4.25 | 4.28 | 4.32 | 4.35 | 4.39 | 4.42 | 4.45 | 4.48 | 4.51 | 4.54 | 4.57 | 4.59 | 4.62 | 4.64 | 4.66 | 4.68 | 4.70 | 4.72 |
| 54 | 58 | 4.17 | 4.20 | 4.24 | 4.28 | 4.32 | 4.36 | 4.40 | 4.43 | 4.47 | 4.51 | 4.54 | 4.57 | 4.60 | 4.63 | 4.66 | 4.69 | 4.72 | 4.74 | 4.76 | 4.78 | 4.80 |
| 55 | 59 | 4.19 | 4.23 | 4.28 | 4.32 | 4.36 | 4.40 | 4.44 | 4.48 | 4.52 | 4.56 | 4.60 | 4.63 | 4.67 | 4.70 | 4.73 | 4.76 | 4.79 | 4.82 | 4.84 | 4.87 | 4.89 |
| 56 | 60 | | 4.26 | 4.31 | 4.35 | 4.40 | 4.44 | 4.49 | 4.53 | 4.57 | 4.61 | 4.65 | 4.69 | 4.73 | 4.77 | 4.80 | 4.84 | 4.87 | 4.90 | 4.93 | 4.96 | 4.98 |
| 57 | 61 | | | 4.34 | 4.39 | 4.43 | 4.48 | 4.53 | 4.58 | 4.62 | 4.67 | 4.71 | 4.75 | 4.80 | 4.84 | 4.88 | 4.91 | 4.95 | 4.99 | 5.02 | 5.05 | 5.08 |
| 58 | 62 | | | | 4.42 | 4.47 | 4.52 | 4.57 | 4.62 | 4.67 | 4.72 | 4.77 | 4.82 | 4.86 | 4.91 | 4.95 | 4.99 | 5.03 | 5.07 | 5.11 | 5.14 | 5.17 |
| 59 | 63 | | | | | 4.51 | 4.56 | 4.61 | 4.67 | 4.72 | 4.77 | 4.83 | 4.88 | 4.93 | 4.98 | 5.03 | 5.07 | 5.12 | 5.16 | 5.20 | 5.24 | 5.28 |
| 60 | 64 | | | | | | 4.60 | 4.65 | 4.71 | 4.77 | 4.83 | 4.88 | 4.94 | 4.99 | 5.05 | 5.10 | 5.15 | 5.20 | 5.25 | 5.29 | 5.34 | 5.38 |
| 61 | 65 | | | | | | | 4.69 | 4.75 | 4.82 | 4.88 | 4.94 | 5.00 | 5.06 | 5.12 | 5.18 | 5.23 | 5.29 | 5.34 | 5.39 | 5.44 | 5.49 |
| 62 | 66 | | | | | | | | 4.80 | 4.86 | 4.93 | 4.99 | 5.06 | 5.12 | 5.19 | 5.25 | 5.31 | 5.37 | 5.43 | 5.49 | 5.54 | 5.59 |
| 63 | 67 | | | | | | | | | 4.91 | 4.98 | 5.05 | 5.12 | 5.19 | 5.26 | 5.33 | 5.39 | 5.46 | 5.52 | 5.59 | 5.65 | 5.70 |
| 64 | 68 | | | | | | | | | | 5.03 | 5.10 | 5.18 | 5.25 | 5.33 | 5.40 | 5.47 | 5.55 | 5.62 | 5.69 | 5.75 | 5.82 |
| 65 | 69 | | | | | | | | | | | 5.15 | 5.23 | 5.31 | 5.39 | 5.47 | 5.55 | 5.63 | 5.71 | 5.79 | 5.86 | 5.93 |
| 66 | 70 | | | | | | | | | | | | 5.29 | 5.37 | 5.46 | 5.55 | 5.63 | 5.72 | 5.80 | 5.89 | 5.97 | 6.05 |
| 67 | 71 | | | | | | | | | | | | | 5.43 | 5.52 | 5.62 | 5.71 | 5.80 | 5.89 | 5.99 | 6.08 | 6.16 |
| 68 | 72 | | | | | | | | | | | | | | 5.59 | 5.69 | 5.79 | 5.89 | 5.99 | 6.09 | 6.18 | 6.28 |
| 69 | 73 | | | | | | | | | | | | | | | 5.75 | 5.86 | 5.97 | 6.08 | 6.18 | 6.29 | 6.40 |
| 70 | 74 | | | | | | | | | | | | | | | | 5.93 | 6.05 | 6.16 | 6.28 | 6.40 | 6.51 |
| 71 | 75 | | | | | | | | | | | | | | | | | 6.12 | 6.25 | 6.37 | 6.50 | 6.62 |
| 72 | 76 | | | | | | | | | | | | | | | | | | 6.33 | 6.46 | 6.60 | 6.74 |
| 73 | 77 | | | | | | | | | | | | | | | | | | | 6.55 | 6.70 | 6.84 |
| 74 | 78 | | | | | | | | | | | | | | | | | | | | 6.79 | 6.95 |
| 75 | 79 | | | | | | | | | | | | | | | | | | | | | 7.05 |

# 532

(c) **Description of Tables:** The tables given in this provision show the dollar amount of the first monthly installment payable for each $1,000 of value of accumulation units applied at the accumulation unit value as of the last day of the second calendar month immediately preceding the effective date of the annuity. The rates shown in the tables are based on the Progressive Annuity Mortality Table, females being regarded as 4 years younger than the actual age, and 3½% interest per annum; and they are equal to the net rates which would apply to a corresponding fixed dollar annuity, divided in each case by the factor of 1.03093. Ages shown in the tables are ages nearest the birthday of the Annuitant on the effective date of the annuity.

(d) **Privilege to Commence Income Payments at Earlier or Later Date:** Although this policy is written to provide for monthly installments commencing on the Maturity Date, the Annuitant may, upon written request to the Company, elect to begin receiving monthly installments on an anniversary prior to the Maturity Date but not earlier than age 50 nearest birthday of the Annuitant, or to continue premium payments of the amount and payable in the manner specified herein, and so defer the commencement of monthly installments until any anniversary subsequent to the Maturity Date but not later than age 70 nearest birthday of the Annuitant. The election to begin receiving monthly installments prior to the Maturity Date shall not be available if the amount of the first monthly installment would be less than $25.00 and the option to continue premium payments beyond the Maturity Date shall not be available if on the Maturity Date any benefits are being allowed under the Total and Permanent Disability Rider, if any, attached to this policy.

(e) *Variable Annuity Installments:* The dollar amounts of the annuity installments under any of the options of this provision are not predetermined, and may change from month to month. The method of calculating such dollar amounts is described in the **Valuation Provisions.**

## BENEFITS PAYABLE TO THE BENEFICIARY PROVISIONS

**6. SELECTION OF OPTIONS BY ANNUITANT** The Annuitant shall have the right, subject to the terms and conditions set forth in these provisions, to elect that the whole or a specified part of the net proceeds which would otherwise be payable in one sum at his death, be payable in accordance with any of the settlement options and to revoke or change any such election. Any such election must be approved by the Company and endorsed on the policy. If a settlement option has been elected by the Annuitant, no payee shall have the right to encumber, alienate or anticipate any of the payments thereunder, or to change the manner of settlement in any way, except that the payee shall have the right to take in one sum the commuted value of any remaining installments under the First Option or to withdraw any part of the proceeds remaining with the Company under the Third or Fourth Option hereinafter provided, if such right has been given by the Annuitant in the election. The Company may defer payment of such amounts for a period of not more than six months.

**7. SELECTION OF OPTIONS BY THE BENEFICIARY** In case the Annuitant has not elected a settlement option as provided above, the Beneficiary may within 60 days, after the Annuitant's death, elect, in lieu of payment in one sum, that the amount or any part thereof due in settlement of this policy be applied under any one of the settlement options hereinafter provided or in any other manner that may be agreed upon with the Company, but any such election may not be revoked without the Company's consent. The settlement options shall not be available to any assignee or to other than a natural person entitled to receive proceeds in his or her own right. The minimum amount of proceeds which may be applied under any settlement option for any payee shall be $2,500 and proceeds of a smaller amount due any payee will be paid in one sum.

**8. SUPPLE-MENTARY CONTRACT** At such time as one of the settlement options becomes operative, this policy shall be surrendered to the Company in exchange for a Supplementary Contract providing for the manner of settlement elected. The payee under a Supplementary Contract shall be restricted to the Beneficiary, and such Supplementary Contract may not be assigned.

**9. DELAYED SETTLEMENTS** The dollar amount of all death benefits shall be determined as of the last day of the second calendar month immediately preceding the date of the receipt of notice of death, and remain in the same dollar amount until paid or applied under one of the settlement options.

**10. PROTECTION FROM CREDITORS** Neither the proceeds nor the payments under any settlement options shall be subject to any Beneficiary's debts, contracts or engagements, nor to any judicial process to levy upon or attach the same for payment thereof.

**11. SETTLEMENT OPTIONS** (a) **Description of Options:**

**FIRST OPTION:** *Installments for Designated Period* — An annuity payable monthly for the number of years selected which shall be from one to thirty years.

Dollar Amount of First Monthly Installment Payable for Each $1,000
of Death Benefit

| Years of Payment | Amount of First Monthly Installment | Years of Payment | Amount of First Monthly Installment | Years of Payment | Amount of First Monthly Installment |
|---|---|---|---|---|---|
| 1 | $82.11 | 11 | $8.81 | 21 | $5.40 |
| 2 | 41.76 | 12 | 8.21 | 22 | 5.23 |
| 3 | 28.32 | 13 | 7.70 | 23 | 5.08 |
| 4 | 21.60 | 14 | 7.26 | 24 | 4.94 |
| 5 | 17.57 | 15 | 6.89 | 25 | 4.81 |
| 6 | 14.89 | 16 | 6.56 | 26 | 4.70 |
| 7 | 12.98 | 17 | 6.27 | 27 | 4.59 |
| 8 | 11.54 | 18 | 6.02 | 28 | 4.49 |
| 9 | 10.43 | 19 | 5.79 | 29 | 4.40 |
| 10 | 9.54 | 20 | 5.58 | 30 | 4.31 |

**SECOND OPTION:** *Life Annuity with 120 or 240 Monthly Installments Guaranteed* — An annuity payable monthly during the lifetime of the payee with a guarantee that if, at death of the payee, installment payments have been made for less than 10 years or 20 years, as selected, the annuity payments will be continued during the remainder of the selected period.

Dollar Amount of First Monthly Installment Payable for Each $1,000
of Death Benefit

| Age | Life Annuity with 10 Yrs. Payments Guaranteed | | Life Annuity with 20 Yrs. Payments Guaranteed | | Age | Life Annuity with 10 Yrs. Payments Guaranteed | | Life Annuity with 20 Yrs. Payments Guaranteed | |
|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | | Male | Female | Male | Female |
| 35 | $3.69 | $3.55 | $3.66 | $3.53 | 53 | $4.82 | $4.47 | $4.57 | $4.32 |
| 36 | 3.73 | 3.58 | 3.70 | 3.56 | 54 | 4.92 | 4.55 | 4.64 | 4.39 |
| 37 | 3.77 | 3.62 | 3.74 | 3.60 | 55 | 5.02 | 4.64 | 4.70 | 4.45 |
| 38 | 3.81 | 3.65 | 3.78 | 3.63 | 56 | 5.13 | 4.73 | 4.77 | 4.51 |
| 39 | 3.86 | 3.69 | 3.82 | 3.66 | 57 | 5.24 | 4.82 | 4.83 | 4.57 |
| 40 | 3.91 | 3.73 | 3.86 | 3.70 | 58 | 5.36 | 4.92 | 4.90 | 4.64 |
| 41 | 3.96 | 3.77 | 3.91 | 3.74 | 59 | 5.49 | 5.02 | 4.96 | 4.70 |
| 42 | 4.01 | 3.81 | 3.95 | 3.78 | 60 | 5.62 | 5.13 | 5.02 | 4.77 |
| 43 | 4.07 | 3.86 | 4.00 | 3.82 | 61 | 5.76 | 5.24 | 5.08 | 4.83 |
| 44 | 4.13 | 3.91 | 4.05 | 3.86 | 62 | 5.90 | 5.36 | 5.14 | 4.90 |
| 45 | 4.19 | 3.96 | 4.10 | 3.91 | 63 | 6.05 | 5.49 | 5.20 | 4.96 |
| 46 | 4.26 | 4.01 | 4.16 | 3.95 | 64 | 6.21 | 5.62 | 5.25 | 5.02 |
| 47 | 4.32 | 4.07 | 4.21 | 4.00 | 65 | 6.37 | 5.76 | 5.30 | 5.08 |
| 48 | 4.40 | 4.13 | 4.27 | 4.05 | 66 | 6.53 | 5.90 | 5.35 | 5.14 |
| 49 | 4.47 | 4.19 | 4.32 | 4.10 | 67 | 6.71 | 6.05 | 5.39 | 5.20 |
| 50 | 4.55 | 4.26 | 4.39 | 4.16 | 68 | 6.89 | 6.21 | 5.42 | 5.25 |
| 51 | 4.64 | 4.32 | 4.45 | 4.21 | 69 | 7.07 | 6.37 | 5.45 | 5.30 |
| 52 | 4.73 | 4.40 | 4.51 | 4.27 | 70 | 7.25 | 6.53 | 5.48 | 5.35 |

**THIRD OPTION:** *Installments of a Designated Amount* — The amount of death benefit may be paid in equal annual, semi-annual, quarterly or monthly installments of a designated dollar amount (not less than $75.00 per annum for each $1,000 of original amount of death benefit left with the Company) until such amount of death benefit, multiplied from month to month by the *net investment factor*, determined in accordance with the **Valuation Provisions**, and decreased by the amount of the installments paid, is exhausted. The final installment shall be only in the amount of any remaining balance.

**FOURTH OPTION** — *Net Investment Income* — The amount of death benefit may be left with the Company and an amount will be paid annually, semi-annually, quarterly or monthly, as selected, which will be equal to the *net investment rate* for the period of such payment, determined in accordance with the **Valuation Provisions,** applied to the amount of the remaining balance of death benefit. If the *net investment rate* is negative, no such payment shall be made and the amount of the remaining balance of death benefit will be reduced by the product of such balance and such negative rate. If at any time the amount of remaining balance of death benefit is reduced to $1,000 or less, such amount shall then be paid in one sum.

(b) **Description of Tables:** The Tables given in the provision for the First and Second Options show the dollar amount of the first monthly installment payable for each $1,000 of death benefit. The rates shown in the tables under the First and Second Settlement Options are based on 3½% interest per annum, and in addition, for the Second Option, are based on the Progressive Annuity Mortality Table; females being regarded as 4 years younger than the actual age; and they are equal to the net rates which would apply to a corresponding fixed dollar annuity, divided in each case by the factor of 1.03093. Ages shown in the table of the Second Option are ages nearest the birthday of the payee on the effective date of the option.

(c) **Variable Annuity Installments:** The dollar amounts of the annuity installments under the First and Second Options of this provision are not predetermined, and may change from month to month. The method of calculating such dollar amounts is described in the **Valuation Provisions.**

**12. DATES OF PAYMENT OF SETTLEMENT OPTIONS** — The first installment payment under the First, Second or Third Settlement Option shall be made within 30 days after approval of claim for settlement, and subsequent installment payments shall be made periodically in accordance with the manner of payment elected. The first payment under the Fourth Settlement Option shall be made at the end of the period selected, measured from the date of approval of the claim for settlement.

**13. DEATH OF PAYEE** — At the death of any payee, after a settlement option becomes operative, the then present value of any unpaid installments certain under the First or Second Option, commuted on the basis of 3½% interest compounded annually, or any then remaining balance of death benefit, under the Third or Fourth Options, multiplied by the applicable *net investment factor*, shall be paid in one sum to the executors or administrators of the payee unless other provision shall have been previously made and approved by the Company.

### NON-FORFEITURE BENEFITS PROVISIONS

**14. CASH VALUE** — The policy may be surrendered prior to the death of the Annuitant and before the first due date of any life annuity benefit payment. Upon application for surrender, the Company will determine the cash value, which will be in an amount equal to the dollar value of the accumulation units of the policy as of the last day of the month in which application for surrender is received. The Company will then pay, upon due surrender of the policy, the cash value, less any policy indebtedness and less the amount shown in the following Table:

| Number of Policy Years Premiums Paid or Years from Date of Issue if this be a Single Premium Policy | Deductions from Dollar Value of Accumulation Units |
|---|---|
| 1 or less | $25 |
| Over 1 but less than 2 | 20 |
| Over 2 but less than 3 | 15 |
| Over 3 but less than 4 | 10 |
| Over 4 but less than 5 | 5 |
| 5 or more | 0 |

**15. POLICY LOANS** — The Company will loan, upon assignment hereof, at any time prior to the discontinuance of premium payments under the policy, any amount which with interest to the next succeeding policy anniversary shall not exceed the lesser of (i) the cash value of the policy at the date of the loan and (ii) the total of the premiums paid under the policy prior to the date of the loan. All outstanding indebtedness on account of any previous policy loans shall be paid out of any new loan. Indebtedness shall include the principal and accrued interest of policy loans.

Interest on a policy loan will accrue at the rate of 3% per annum payable on each policy anniversary. Unpaid interest will be added to the principal and bear interest at the same rate. If the total indebtedness herein shall at any time equal or exceed the cash value, the policy shall become of no value 31 days after notice has been mailed to the last known address of the Annuitant and any assignee of record.

Outstanding indebtedness may be repaid at any time prior to the discontinuance of premium payments under the policy. Outstanding indebtedness will be deducted from the amount of any death benefit or cash value payable under the policy. If there is outstanding indebtedness when premium payments are discontinued under the policy, either at or prior to its maturity date, the number of accumulation units then credited to the policy shall be reduced by the number of the accumulation units, based on their then current value, equivalent to the amount of outstanding indebtedness and such outstanding indebtedness will be cancelled.

Such a number of accumulation units which, based on their value at the effective date of a policy loan, are equivalent to the amount of such policy loan, shall be allocated to the *policy loan account* and, during the period of the loan, their unit value shall be determined as provided in the **Valuation Provisions.**

Upon repayment of any outstanding indebtedness, the number of accumulation units under this policy allocated to the *policy loan account*, shall be reduced by the number of such units equal in value to the amount of such repayment and the number of accumulation units under this policy which are not allocated to the *policy loan account* shall be increased by the number of accumulation units. equal in value, (at the accumulation unit value as of the last day of the calendar month in which repayment is made) as determined by the **Valuation Provisions,.** to the amount of such repayment.

**16. DEFERMENT OF CERTAIN PAYMENTS** — The Company reserves the right to defer the granting of a loan, or the payment of a cash surrender value, for a period not exceeding six months from the date application therefor is received at the Home Office, except a loan to be applied to the payment of a premium on the policy.

**17. AUTOMATIC BENEFIT**  If, on the expiration of the grace period for the payment of any required premium in default prior to the maturity date, no non-forfeiture option has been elected, the policy shall continue in force as a paid-up deferred annuity with the number of accumulation units then credited to the policy reduced by the number of accumulation units (based on their then current value) equivalent to any policy indebtedness and the deduction set forth in the table under **Provision 14.** The insurance benefits shall cease immediately upon discontinuance of required premium payments.

## VALUATION PROVISIONS

**18. NET INVESTMENT RATE AND NET INVESTMENT FACTOR**  The *net investment rate* applicable each month to accumulation units and annuity units shall be equal to the adjusted *gross investment rate* for such month decreased by .0015. Such adjusted *gross investment rate* shall be a percentage rate determined each month from the total investment experience of the Company and shall be based on the investment income and capital gains and losses, realized and unrealized, and less the sum of federal income taxes and other taxes, if such other taxes are measured by investment income and capital gains and losses, realized or unrealized, or either of them, accrued on policies of this class. Such adjusted *gross investment rate* shall be a positive or a negative rate, as the case may be. The *net investment factor* shall be the sum of 1.0000 plus the *net investment rate*.

**19. ACCUMULATION UNIT**  The dollar value of an accumulation unit as of June 30, 1956, was fixed at $1.00. The dollar value of an accumulation unit as of the last day of any calendar month thereafter shall be determined by multiplying the dollar value of an accumulation unit as of the last day of the immediately preceding calendar month by the *net investment factor* for the calendar month for which the accumulation unit value is being determined. The dollar value of an accumulation unit as of any other date thereafter is equal to the corresponding value as of the last day of the calendar month immediately preceding the month in which such date occurs.

The value of an accumulation unit allocated to the *policy loan account* shall remain the same during the period of the loan as existed on the effective date of the loan.

**20. ANNUITY UNITS**  The number of annuity units for any annuity payable under the **Benefits To The Annuitant Provisions** or under the First or Second Settlement Option, shall be equal to the dollar amount of the first monthly annuity installment divided by the value of an annuity unit as of the effective date of the annuity. Once annuity payments have begun, the number of annuity units will remain fixed.

**21. ANNUITY UNIT VALUE**  The value of an annuity unit on June 30, 1956, was fixed at $1.00. The value of an annuity unit for any month thereafter shall be determined by multiplying the value of an annuity unit for the preceding month by the product of (a) .9971 and (b) the *net investment factor* for the second calendar month preceding the month for which the value of an annuity unit is being calculated.

**22. CALCULATION OF SECOND AND SUBSEQUENT VARIABLE ANNUITY INSTALLMENTS**  The dollar amount of each monthly annuity installment, after the first such installment, payable under the **Benefits To The Annuitant Provisions** or under the First or Second Settlement Option, shall be equal to the number of annuity units multiplied by the value of an annuity unit for the calendar month in which the installment is payable. The Company guarantees that the dollar amount of such installments after the first shall not be affected by variations in the actual mortality experience of payees from the mortality experience assumptions of the Progressive Annuity Mortality Table.

## MISCELLANEOUS PROVISIONS

**23. THE CONTRACT**  This policy and the application therefor, a copy of which is attached hereto and made a part hereof, constitute the entire contract between the parties. All statements made by the Annuitant or on his behalf shall, in the absence of fraud, be deemed representations and not warranties, and no such statement shall be used in defense to a claim under this policy unless it is contained in the application and a copy of the application is attached to this policy when issued.

**24. INCONTESTABILITY**  This policy, excepting any provisions granting benefits in event of total and permanent disability, shall be incontestable after two years from its date of issue, except for nonpayment of premiums.

**25. MISSTATEMENT OF AGE OR SEX**  If any payee's age or sex has been misstated, any amount payable by the Company at any time shall be such as the premium would have provided at the correct age or sex. For annuity payments subsequent to such a correction of age or sex the dollar amount of annuity payments so determined will be adjusted, on an equivalent basis, for any underpayments or overpayments previously made.

**26. SUICIDE**  If the Annuitant shall commit suicide while sane or insane within two years from the date of issue hereof, the liability of the Company under this policy shall be limited to the premiums actually paid hereon less any indebtedness due to the Company.

**27. FREQUENCY OF PAYMENTS** — Payment of benefit to the Annuitant or Beneficiary under any provision hereof will be made monthly unless quarterly, semi-annual or annual payments are requested by the payee in writing. If at any time the payments to any payee are or become less than $25.00 each, the Company shall have the right to change the frequency of payments to such intervals as will result in payments of at least $25.00.

**28. CHANGE OF BENEFICIARY OR MODE OF PAYMENT OF PROCEEDS** — While this policy is in force, if the right to change the beneficiary has been reserved, the Annuitant, subject to the terms of any existing assignment, may change the beneficiary, or may change the mode of payment of the proceeds of this policy to any mode of payment upon which the Annuitant and the Company may agree, by filing at the Home Office of the Company a written request therefor accompanied by this policy for endorsement. Such change, either in beneficiary or mode of payment of proceeds, shall take effect only upon endorsement of the same on this policy by the Company. During the lifetime of any irrevocable Beneficiary the written consent of such Beneficiary shall be necessary to any revocation or change of beneficiary. If there be more than one Beneficiary, whether revocably or irrevocably designated, the interest of any Beneficiary who predeceases the Annuitant shall pass to the survivor or survivors unless otherwise directed by the Annuitant and so endorsed by the Company on this policy. If no designated Beneficiary survives the Annuitant and it is not otherwise provided, the proceeds of this policy shall be payable in one sum to the executors, administrators or assigns of the Annuitant.

**29. MANNER OF PAYMENT** — All amounts payable by the Company are payable at its Home Office. In any settlement under the policy by reason of death, surrender, or otherwise, the Company may require the return of the policy. Due proof of the Annuitant's death or disability, or of the Beneficiary's death, must be submitted to the Company at its Home Office in conformance with forms furnished by it. Before making or continuing any annuity payment the Company will require satisfactory evidence as to the age of the person or persons during whose lifetime payments are to be made. Any such payment shall not be due until the evidence required shall have been received at the Home Office of the Company.

**30. PROOF OF SURVIVAL** — The Company, prior to making any annuity payments under the policy, may require evidence satisfactory to it that the payee was alive at 12:00 o'clock noon, Standard Time, at the place where the payee resides, on the due date of such payment, and in case of such requirement, any such payment shall not be due until the evidence required shall have been received at the Home Office of the Company.

**31. CONTROL, ASSIGNMENTS, ETC.** — In the absence of a special endorsement or agreement filed with the Company creating an exception hereto, the Annuitant may, without the consent of any revocable beneficiary, assign or surrender this policy, amend or modify the same with the consent of the Company, and exercise, receive and enjoy every other right, benefit and privilege contained in this policy.

**32. NOTICE OF ASSIGNMENT** — No assignment of this policy shall be binding on the Company until it is filed with the Company at its Home Office. The Company will assume no responsibility for the validity or sufficiency of any assignment, and any claim thereunder shall be subject to proof of interest and the extent thereof.

**33. MODIFICATION OF CONTRACT** — Only the President, a Vice President, the Secretary or an Assistant Secretary of the Company has power to change, modify or waive the provisions of this policy, and then only in writing. The Company shall not be bound by any promise or representation heretofore or hereafter made by or to any agent or person other than as above enumerated.

**34. CURRENCY** — All amounts payable under this policy, either to or by the Company, shall be payable in lawful currency of the United States of America.

Rider Providing for Waiver of Premium Benefit
in Event of
## TOTAL AND PERMANENT DISABILITY
Attached to and made a part of Policy No.: Specimen on the Life of John Doe

Upon receipt at the Home Office of the Company, in accordance with the conditions hereinafter stated, of written notice of claim of disability and proof that the Annuitant has become totally and permanently disabled by bodily injury or disease originating after the effective date of this rider, and as defined herein, the Company will waive the payment of all premiums falling due under the policy during the continuance of such total and permanent disability until the Maturity Date stated on the face of the policy or until age 65 for males or age 60 for females, whichever first occurs. The Waiver of Premium shall begin with the premium the due date of which next succeeds the date of commencement of such disability; provided, however, that no premium shall be waived, the due date of which is more than six months prior to the date of receipt at the Home Office of the Company of written notice and proof of claim hereunder. The amount payable under any settlement will not be reduced by any premiums waived under this rider and cash values will be the same as if the premiums so waived had been paid in cash.

**CONSIDERATION** — This rider is issued in consideration of the payment of a premium of $39.60 included in the premium stated on the face of the policy and payable at the times and in the manner there specified. Any premium on the policy falling due on or after the termination of this rider shall automatically be reduced by the premium for this rider.

**DEFINITION OF TOTAL AND PERMANENT DISABILITY** — Disability shall be deemed to be total when the Annuitant is prevented thereby from engaging in any occupation or from performing any work for compensation or profit. Such total disability shall be presumed to be permanent (but only for the purpose of determining the commencement of liability hereunder) when it is present and has existed continuously as above set forth for not less than six consecutive months. Without prejudice to any other cause of disability, the entire and irrecoverable loss of the sight of both eyes or the total and permanent loss by removal or disease of the use of both hands or both feet or of one hand and one foot shall be considered as total and permanent disability within the meaning hereof.

**NOTICE AND PROOF OF CLAIM** — Written notice of claim and satisfactory proof of total and permanent disability of the Annuitant must be presented to the Company at its Home Office (a) while the Annuitant is living and during the continuance of total and permanent disability and (b) before the policy anniversary on which the age of the Annuitant at nearest birthday is sixty; provided, however, that failure to give such notice and proof within such times shall not invalidate any such claim if it shall be shown that it was not reasonably possible to give such notice and proof within such times and that notice and proof were given as soon as was reasonably possible. In case premiums on the said policy have been

discontinued before receipt at the Home Office of written notice and proof of claim hereunder, disability benefits shall be allowed only if such notice and proof are received within one year of the due date of the first premium discontinued, and if the total disability for which claim is made commenced prior to the due date of such premium, or subsequent to the due date of such first premium discontinued but within the grace period allowed by said policy for payment of such premium. In either event, no premium shall be waived the due date of which is more than six months prior to receipt of such notice and proof and the Annuitant shall be liable for an amount equal to the current value of such number of accumulated units as would have been credited to the policy if premium payments had not been discontinued before such six months period.

As a condition precedent to approval of claim or to continuance thereof, the Company shall have the right and opportunity to have one or more physicians designated by it examine the Annuitant when and so often as it may reasonably require.

**PROOF OF CONTINUANCE OF DISABILITY AND RECOVERY FROM DISABILITY** — Even though proof of disability has been accepted by the Company as satisfactory, the Annuitant shall, whenever required by the Company, furnish due proof of the continuance of such disability, but after such disability shall have continued for two full years the Company will not demand such proof more often than once in each subsequent year. If the Annuitant fails to furnish such proof, or on request fails to submit to a physical examination by physicians of the Company's designation or so far recovers as to be able to engage in any occupation or to perform any work for compensation or profit, then all premiums thereafter falling due must be paid as originally provided in the policy. If any such premiums are past due they shall be payable in accordance with the reinstatement provision of the policy. The Annuitant agrees to give immediate notice to the Company upon recovery from such disability. Failure to give such notice shall cancel the foregoing disability benefits.

**EXCLUSIONS** — The disability benefits herein provided shall not be granted if the disability results (1) from intentional self-inflicted injury, (2) from any act attributable to war, declared or undeclared, or (3) from military, naval or air service for any country at war, declared or undeclared.

**TERMINATION** — This disability rider shall terminate (a) on the policy anniversary on which the age of the Annuitant at nearest birthday is sixty or (b) when any premium on this rider or on the policy to which it is attached is not paid when due or within the days of grace for payment of such premium; or it may be terminated on the due date of any premium on the policy by written request of the Annuitant accompanied by the policy for endorsement.

### THE VARIABLE ANNUITY LIFE INSURANCE COMPANY OF AMERICA
Incorporated

Countersigned.... Specimen ........................................

Registrar

ROBERT A. CRICHTON
*President*

Effective Date November 1, 1956
    155 F.Supp.—34½

538

10/9/55

**"DEFERRED VARIABLE ANNUITY POLICY"**

**NO.**   Specimen   **ANNUITANT:**   John Doe

**TOTAL PREMIUM:** $1,000.00

**PREMIUM DUE DATES:** 1st of November each year

**MATURITY DATE:** November 1, 1986

Variable Life Annuity Benefits Payable Commencing at a Time between Age 50 and 70, Selected by the Annuitant. Life Insurance Benefits if provided in Schedule of Insurance. Benefits for Disability if provided by Rider. Premiums Payable Until Maturity Date, or by a Single Premium.

**ANNUITY PAYMENTS PROVIDED BY THIS POLICY ARE VARIABLE
AND ARE NOT GUARANTEED AS TO FIXED DOLLAR AMOUNT**