SECURITIES AND EXCHANGE COMMISSION *v.*
VARIABLE ANNUITY LIFE INSURANCE
CO. OF AMERICA ET AL.

No. 290.   Argued January 15, 19, 1959.—
Decided March 23, 1959.*

---

*Together with No. 237, *National Association of Securities Dealers, Inc.,* v. *Variable Annuity Life Insurance Co. of America et al.,* also on certiorari to the same Court.

*Thomas G. Meeker* argued the cause for petitioner in No. 290. With him on the brief were Solicitor General *Rankin, John F. Davis, David Ferber* and *Pace Reich.*

*John H. Dorsey* argued the cause and filed a brief for petitioner in No. 237.

*Roy W. McDonald* and *James M. Earnest* argued the causes for the Variable Annuity Life Insurance Company of America, respondent. With them on the brief was *Malcolm Fooshee.*

*Benjamin H. Dorsey* argued the causes for the Equity Annuity Life Insurance Co., respondent. With him on the brief were *Smith W. Brookhart* and *Ralph E. Becker.*

*Frank F. Roberson* filed a brief in No. 290 for the Mutual Life Insurance Company of New York et al., as *amici curiae,* in support of respondents.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is an action instituted by the Securities and Exchange Commission [1] to enjoin respondents from offering their annuity contracts to the public without registering them under the Securities Act of 1933, 48 Stat. 74, 15 U. S. C. § 77a, and complying with the Investment Company Act of 1940, 54 Stat. 789, 15 U. S. C. § 80a. The District Court denied relief, 155 F. Supp. 521; and the Court of Appeals affirmed, 103 U. S. App. D. C. 197, 257 F. 2d 201. The case is here on petitions for writs of certiorari which we granted, 358 U. S. 812, because of the importance of the question presented.

---

[1] National Association of Securities Dealers, Inc., petitioner in No. 237, and the Equity Annuity Life Ins. Co., a respondent in each case, were allowed to intervene.

Respondents are regulated under the insurance laws of the District of Columbia and several other States. It is argued that that fact brings into play the provisions of the McCarran-Ferguson Act, 59 Stat. 33, 15 U. S. C. § 1011, § 2 (b) of which provides that "No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . ." It is said that the conditions under which that law is applicable are satisfied here. The District of Columbia and some of the States are "regulating" these annuity contracts and, if the Commission is right, the Federal Acts would at least to a degree "supersede" the state regulations since the Federal Acts prescribe their own peculiar requirements.[2] Moreover, "insurance" or "annuity" contracts are exempt from the Securities Act when "subject to the supervision of the insurance commissioner . . . of any State . . . ."[3] Respondents are also exempt from the Investment Company Act if they are "organized as an insurance company, whose primary and predominant business activity is the writing of insurance . . . and which is subject to supervision by the insurance commissioner . . . of a State . . . ."[4] While the term "security" as defined in the Securities Act[5] is broad enough to include any

---

[2] For example, the Investment Company Act has provisions governing the size of investment companies, § 14; the affiliations of directors, officers, and employees, § 10; the relation of investment advisers and underwriters of investment companies, § 15; the transactions between investment companies and their affiliates and underwriters, § 17; the capital structure of investment companies, § 18; their dividend policies, § 19; their loans, § 21.

[3] § 3 (a) (8).

[4] §§ 3 (c) (3) and 2 (a) (17).

[5] Section 2 (1) provides:

"When used in this title, unless the context otherwise requires—

"(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or

"annuity" contract, and the term "investment company" as defined in the. Investment Company Act[6] would embrace an "insurance company," the scheme of the exemptions lifts *pro tanto* the requirements of those two Federal Acts to the extent that respondents are *actually* regulated by the States as insurance companies, *if indeed they are such*. The question common to the exemption provisions of the Securities Act and the Investment Company Act and to § 2 (b) of the McCarran-Ferguson Act is whether respondents are issuing contracts of insurance.

We start with a reluctance to disturb the state regulatory schemes that are in actual effect, either by displacing them or by superimposing federal requirements on transactions that are tailored to meet state requirements. When the States speak in the field of "insurance," they speak with the authority of a long tradition. For the

---

participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 15 U. S. C. § 77 (b)(1).

[6] Section 3 (a) provides in part:

"When used in this title, 'investment company' means any issuer which—

"(1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities;

.    .      .        .         .

"(3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."

regulation of "insurance," though within the ambit of federal power (*United States* v. *Underwriters Assn.*, 322 U. S. 533), has traditionally been under the control of the States.

We deal, however, with federal statutes where the words "insurance" and "annuity" are federal terms. Congress was legislating concerning a concept which had taken on its coloration and meaning largely from state law, from state practice, from state usage. Some States deny these "annuity" contracts any status as "insurance." [7] Others accept them under their "insurance" statutes.[8] It is apparent that there is no uniformity in the rulings of the States on the nature of these "annuity" contracts. In any event how the States may have ruled is not decisive. For, as we have said, the meaning of "insurance" or "annuity" under these Federal Acts is a federal question.

While all the States regulate "annuities" under their "insurance" laws, traditionally and customarily they have been fixed annuities, offering the annuitant specified and definite amounts beginning with a certain year of his or her life. The standards for investment of funds underlying these annuities have been conservative. The variable annuity introduced two new features. First, premiums collected are invested to a greater degree in common stocks and other equities. Second, benefit payments vary with the success of the investment policy. The first variable annuity apparently appeared in this country about 1952 when New York created the College Retirement Equities Fund [9] to provide annuities for teachers.

---

[7] See 1 CCH, Blue Sky Reporter (1956) #4711; *Spellacy* v. *American Life Ins. Assn.*, 144 Conn. 346, 131 A. 2d 834.

[8] See *People* v. *Supreme Brotherhood*, 193 Misc. 996, 86 N. Y. S. 2d 127.

[9] N. Y. Laws 1952, c. 124.

It came into existence as a result of a search for a device that would avoid paying annuitants in depreciated dollars.[10]   The theory was that returns from investments in common stocks would over the long run tend to compensate for the mounting inflation.   The holder of a variable annuity cannot look forward to a fixed monthly or yearly amount in his advancing years.   It may be greater or less, depending on the wisdom of the investment policy.   In some respects the variable annuity has the characteristics of the fixed and conventional annuity: payments are made periodically; they continue until the annuitant's death or in case other options are chosen until the end of a fixed term or until the death of the last of two persons; payments are made both from principal and income; and the amounts vary according to the age and sex of the annuitant.   Moreover, actuarially both the fixed-dollar annuity and the variable annuity are calculated by identical principles.   Each issuer assumes the risk of mortality from the moment the contract is issued   That risk is an actuarial prognostication that a certain number of annuitants will survive to specified ages.   Even if a substantial number live beyond their predicted demise, the company issuing the annuity—whether it be fixed or variable—is obligated to make the annuity payments on the basis of the mortality prediction reflected in the contract.   This is the mortality risk assumed both by respondents and by those who issue fixed annuities.   It is this feature, common to both, that respondents stress when they urge that this is basically an insurance device.[11]

---

[10] See Morrisey, Dispute Over the Variable Annuity, 35 Harv. Bus. Rev. 75; Johnson, The Variable Annuity: What It is and Why It is Needed, Ins. L. J., June 1956, p. 357; Day and Melnikoff, The Variable Annuity as a Life Insurance Company Product, 10 J. Am. Soc. Ch. L. Under. 45; Barrons, Vol. 36, Jan. 23, 1956, p. 3.

[11] See Day, A Variable Annuity is Not a "Security," 32 Notre Dame Law. 642

The difficulty is that, absent some guarantee of fixed income, the variable annuity places all the investment risks on the annuitant, none on the company.[12] The holder gets only a *pro rata* share of what the portfolio of equity interests reflects—which may be a lot, a little, or nothing. We realize that life insurance is an evolving institution. Common knowledge tells us that the forms have greatly changed even in a generation. And we would not undertake to freeze the concepts of "insurance" or "annuity" into the mold they fitted when these Federal Acts were passed. But we conclude that the concept of "insurance" involves some investment risk-taking on the part of the company. The risk of mortality, assumed here, gives these variable annuities an aspect of insurance. Yet it is apparent, not real; superficial, not substantial. In hard reality the issuer of a variable annuity that has no element of a fixed return assumes no true risk in the insurance sense. It is no answer to say that the risk of declining returns in times of depression is the reciprocal of the fixed-dollar annuitant's risk of loss of purchasing power when prices are high and gain of purchasing power when they are low. We deal with a more conventional concept of risk-bearing when we speak of "insurance." For in common understanding "insurance" involves a guarantee that at least some fraction of the benefits will be payable in fixed amounts. See *Spellacy v. American Life Ins. Assn.*, 144 Conn. 346, 354–355, 131 A. 2d 834, 839; Couch, Cyclopedia of Insurance Law, Vol. 1, § 25; Richards, Law of Insurance, Vol. 1, § 27; Appleman, Insurance Law and Practice, Vol. 1, § 81. The companies that issue these annuities take the risk of failure.

---

[12] See Bellinger, Hagmann and Martin, The Meaning and Usage of the Word "Annuity," 9 J. Am. Soc. Ch. L. Under. 261; Haussermann, The Security in Variable Annuities, Ins. L. J., June 1956, p. 382.

But they guarantee nothing to the annuitant except an interest in a portfolio of common stocks or other equities [13]—an interest that has a ceiling but no floor.[14]

---

[13] See *Securities & Exchange Comm'n* v. *Howey Co.*, 328 U. S. 293, 298–299:

". . . an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." See Loss and Cowett, Blue Sky Law (1958), pp. 351, 356–357.

[14] These companies use an assumed net investment rate of 3½ percent per annum in the actuarial calculation of the initial annuity payment. If the net investment rate were at all times precisely 3½ percent, the amount of annuity payments would not vary. But there is no guarantee as to this. The companies use a reporting device, the annuity unit, the value of which informs the annuity holder of the variations in the company's actual returns from the assumed investment rate of 3½ percent. To state the matter in more detail: the amount of any payment depends on the value of the "annuity unit" and the number of such units held by the annuitant. At the time when he has paid all of his premium and is entitled to his first annuity payment, he will have a certain monetary interest in the fund (determined by the number of "accumulation units" he holds). The first payment is determined by reference to standard annuity tables, assuming a net investment return of 3½ percent per annum. It is the amount per month which a capital contribution of the annuitant's interest in the fund by a person of his age and sex would buy. This figure is converted into annuity units by dividing it by the then value of an annuity unit. The number of annuity units held by the annuitant remains constant throughout the payout period.

The value of an annuity unit is determined each month as follows: The value of the unit for the preceding month is multiplied by the net investment factor (adjusted to neutralize the 3½ percent interest factor used in the annuity table), which is the sum of one plus the net investment rate. The net investment rate is (after a slight reduction for a margin to cover expenses, and provide for contingency reserves and addition to surplus) the ratio of investment income plus (minus) net realized and unrealized capital gains (losses) less certain

There is no true underwriting of risks,[15] the one earmark of insurance as it has commonly been conceived of in popular understanding and usage.

*Reversed.*

Mr. Justice Brennan, with whom Mr. Justice Stewart joins, concurring.

I join the opinion and judgment of the Court. However, there are additional reasons which lead me to the Court's result, and since the nature of this case lends it to rather extended treatment, I will express these reasons separately.

*First.* The facts of this case are quite complex, but the basic problem involved is much more simple. I will try to point it up before developing the details of the sort of contracts sold by the respondents. It is one of the coverage of two Acts of Congress which concentrated on applying specific forms of regulatory controls to the various ways in which organizations get and administer other people's money—the Securities Act of 1933 [1] and the Investment Company Act of 1940.[2] These Acts were specifically drawn to exclude any "insurance policy" and any "annuity contract" (Securities Act § 3 (a)(8))

---

taxes to the value of the fund during that month. The number of annuity units held times the value of each unit in a month produces the annuity payment for that month.

[15] There is one true insurance feature to some of these policies, though it is ancillary and secondary to the annuity feature. If the applicant is insurable and 60 years of age or under, he gets life insurance on a decreasing basis for a term of five years.

[1] 48 Stat. 74, as amended, 15 U. S. C. §§ 77a–77aa.

[2] 54 Stat. 789, as amended, 15 U. S. C. §§ 80a–1 to 80a–52.

The Court's opinion makes it clear why the issue is identical under the McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U. S. C. §§ 1011–1015.

and any "insurance company"[3] (Investment Company Act § 3 (c)(3)) from their coverage. These exclusions were to take effect where the issuer of the policy or contract was subject to the supervision of the state "insurance commissioner, bank commissioner, or any agency or officer performing like functions". (Securities Act § 3 (a)(8)) or where a company classifiable as an "insurance company" was "subject to supervision by the insurance commissioner or a similar official or agency of a State" (Investment Company Act § 2 (a)(17)). The exclusions left these contracts and companies to the sole control of such state officials. Except for these exclusions, there is little doubt that these contracts and the companies issuing them would be subject to the Federal Acts.[4]

---

[3] Defined as a "company which is organized as an insurance company, whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies, and which is subject to supervision by the insurance commissioner or a similar official or agency of a State . . . ." Investment Company Act § 2 (a)(17). The business of the respondents here consists solely of issuing contracts of the nature of those in question here.

[4] Under the Securities Act, it would appear that in the case of the ordinary insurance policy, the exemption would be just confirmatory of the policy's noncoverage under the definition of security. See H. R. Rep. No. 85, 73d Cong., 1st Sess. 15. The status of an ordinary annuity contract might be different. But, in any event, absent the specific insurance exclusion, it would appear that the variable annuity contract would come under the term "investment contract" or possibly "certificate of interest or participation in any profit-sharing agreement" in the definition of security, § 2 (1). On the other hand, even an ordinary insurance company might be an investment company within the meaning of § 3 (a)(1) and § 3 (a)(3) of the Investment Company Act, were it not for the specific exemption. The Chief Counsel of the SEC's Investment Trust Study testified that the specific exemption was necessary in the light of the definition. See Hearings before Subcommittee of the Senate Committee on Banking and Currency on S. 3580, 76th Cong., 3d Sess. 181. A fortiori a company issuing the sort of contracts in question here would be included if there were no question of the insurance exemption.

Why these exclusions? They could not have been made out of some general desire on the part of Congress to avoid any concurrent regulation by both the Federal Government and the States of investments or companies subject to the two Acts. On the contrary, § 18 of the Securities Act and § 50 of the Investment Company Act preserve generally the jurisdiction of state officials over their subject matter; the former in terms of "the jurisdiction of the securities commission (or any agency or office performing like functions) of any State" and the latter in terms of "the jurisdiction of any other commission, board, agency, or officer of . . . any State or political subdivision." Conversely, of course, however adequately State Securities Commissioners might regulate an investment, it was not for that reason to be freed from federal regulation. Concurrent regulation, then, was contemplated by the Acts as a quite generally prevailing matter. Nor is it rational to assume that Congress thought that *any* business whatsoever regulated by a specific class of officials, the State Insurance Commissioners, would be for that reason so perfectly conducted and regulated that all the protections of the Federal Acts would be unnecessary. This approach of personally selective deference to the state administrators is hardly to be attributed to Congress. The point must have been that there then was a form of "investment" known as insurance (including "annuity contracts") which did not present very squarely the sort of problems that the Securities Act and the Investment Company Act were devised to deal with, and which were, in many details, subject to a form of state regulation of a sort which made the federal regulation even less relevant.

At this time, of course, the sort of "variable annuity" contract with which we are concerned in this case did not exist. When Congress made the exclusions provided for in the Acts, it did not make them with the "variable

annuity" contract before it. Of course, the point is not that if the insurance industry seeks to retain its exemption, it must limit itself to the forms of policies and contracts in effect in 1933 and 1940. But if a brand-new form of investment arrangement emerges which is labeled "insurance" or "annuity" by its promoters, the functional distinction that Congress set up in 1933 and 1940 must be examined to test whether the contract falls within the sort of investment form that Congress was then willing to leave exclusively to the State Insurance Commissioners. In that inquiry, an analysis of the regulatory and protective purposes of the Federal Acts and of state insurance regulation as it then existed becomes relevant.[5]

At the core of the 1933 Act are the requirements of a registration statement and prospectus to be used in connection with the issuance of "securities"—that term being very broadly defined.[6] Detailed schedules, set forth

---

[5] No subsequent development in state insurance regulation appears to have occurred which would better adapt the system to regulation of companies performing the functions of investment trusts; but of course, in any event, the issue is the scope of state regula.ion in 1933 and 1940. The basic patterns do not appear to have changed and present-day regulation (apart from any measures which may have been taken specifically to deal with the contracts in question) can be examined to see the sort of regulation that Congress was deferring to in the Acts.

[6] ". . . any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." Securities Act § 2 (1), 15 U. S. C. § 77 (b)(1).

in the Act, list the material that the registration statement and the prospectus are to contain.[7] The emphasis is on disclosure; the philosophy of the Act is that full disclosure of the details of the enterprise in which the investor is to put his money should be made so that he can intelligently appraise the risks involved.

The regulation of life insurance and annuities by the States proceeded, and still proceeds, on entirely different principles. It seems as paternalistic as the Securities Act of 1933 was keyed to free, informed choice. Prescribed contract clauses are ordained legislatively or administratively. Solvency and the adequacy of reserves to meet the company's obligations are supervised by the establishment of permissible categories of investments and through official examination.[8] The system does not depend on disclosure to the public, and, once given this form of regulation and the nature of the "product," it might be difficult in the case of the traditional life insurance or annuity contract to see what the purpose of it would be.

This congressional division of regulatory functions is rational and purposeful in the case of a traditional life insurance or annuity policy, where the obligations of the company were measured in fixed-dollar terms and where the investor could not be said, in any meaningful sense, to be a sharer in the investment experience of the com-

---

[7] Securities Act §§ 7 and 10 and Schedules A and B.

[8] A leading text on life insurance outlines the areas of state life insurance regulation as follows: the establishment of a standard of solvency for the setting up of minimum reserves; the organization of domestic companies and the admission of foreign insurers; the rendition of annual statements and the making (frequently on a cooperative basis among the States) of periodic examinations; overseeing the equitable treatment of policyholders by prescribing contract terms and checking misrepresentation, discrimination, rebating and "twisting"; licensing and regulating the conduct of agents; and supervision of investments in accord with a statutory permissive list. Huebner and Black, Life Insurance (5th ed. 1958), pp. 518–524.

pany. In fact, one of the basic premises of state regulation would appear to be that in one sense the investor in an annuity or life insurance company *not* become a direct sharer in the company's investment experience; that his investment in the policy or contract be sufficiently protected to prevent this. But the situation changes where the coin of the company's obligation is not money but is rather the present condition of its investment portfolio. To this extent, the historic functions of state insurance regulation become meaningless. Prescribed. limitations on investment. and examination of solvency and reserves become perfectly circular to the extent that there is no obligation to pay except in terms measured by one's portfolio. But beyond controlling corporate solvency and the adequacy of reserves, and maintaining observance of the legal. list of investments, the state plans of regulation do not go in regulating investment policy. Where the nature of the obligation assumed is such, the federally protected interests in disclosure to the investor of the nature of the corporation to whom he is asked to entrust his money and the purposes for which it is to be used become obvious and real. The contract between the investor and the organization no longer squares with the sort of contract in regard to which Congress in 1933 thought its "disclosure" statute was unnecessary.

The provisions of the Investment Company Act of 1940, which passes beyond a simple "disclosure" philosophy, also are informed by policies that are very relevant to the contracts involved in this case. While the Act does cover face-amount certificate companies whose obligations are specified in fixed-dollar amounts,[9] the majority of its provisions are of greatest regulatory relevance in the case of the much more common sort of

[9] See § 3 (a) (2). - Specific regulatory provisions for this sort of company are found in § 28. Reserve requirements are established by the Federal Act as a method of regulation.

investment company, where the investors (or at least certain categories of them) participate on an "equity" basis in the investment experience of the enterprise. Salient regulatory provisions call for registration and recital, by an investment company, of its investment policies and operating practices; [10] regulate the relationships between the company and its investment adviser, including fees and provisions for termination of the contract; [11] regulate trading practices,[12] changes in investment policy,[13] the issuance of senior securities,[14] proxies and voting trusts,[15] the terms of redemption by investors of their interests in the company; [16] regulate, in the case of periodic investment plans (which were made subject to special regulation), the "sales load," or amount of the investor's payment that does not become part of his interest in the enterprise; [17] and provide for detailed reports to investors.[18] While these controls apply in many cases to fixed-dollar obligations, like face-amount certificates and the bonds of closed-end investment companies, they are of particular relevance to situations where the investor is committing his funds to the hands of others on an equity basis, with the view that the funds will be invested in securities and his fortunes will depend on the success of the investment. The traditional state insurance department regulation of contract terms, reserves. solvency, and permissible investments simply does not touch the points of definition of investment policy and investment technique, and control over investment policy changes and over the interests of the men who shape the policies of investment and furnish investment advice that the 1940 Federal Act provides. These controls may be largely irrelevant to traditional banks and insurance companies, which Congress clearly exempted; they were not investing

---

[10] § 8.
[11] § 15.
[12] § 12.
[13] § 13.
[14] § 18.
[15] § 20.
[16] § 22.
[17] § 27.
[18] § 30 (d).

heavily in equity securities and holding out the possibilities of capital gains through fund management; but where the investor is asked to put his money in a scheme for managing it on an equity basis, it is evident that the Federal Act's controls become vital.

This is not to say that because subjection of the contracts in question here to federal regulation is desirable, it has in fact been accomplished; but one must apply a test in terms of the purposes of the Federal Acts as a guide to interpreting the scope of an exemption from their coverage for "insurance." Cf. *Securities & Exchange Comm'n* v. *W. J. Howey Co.*, 328 U. S. 293, 299. When Congress passed the Securities Act of 1933 and the Investment Company Act of 1940, no State Insurance Commissioner was, incident to his duties in regulating insurance companies, engaged in the sort of regulation, outlined above as provided in the Federal Acts, that Congress thought would be appropriate for the protection of people entrusting their money to others to be invested on an equity basis. There is no reason to suppose that Congress intended to make an exemption of forms of investment to which its regulatory scheme was very relevant in favor of a form of state regulation which would not be relevant to them at all.

*Second.* Much bewilderment could be engendered by this case if the issue were whether the contracts in question were "really" insurance or "really" securities—one or the other. It is rather meaningless to view the problem as one of pigeonholing these contracts in one category or the other. Obviously they have elements of conventional insurance, even apart from the fixed-dollar term life insurance and the disability waiver of premium insurance sold with some of these contracts (both of which are quite incidental to the main undertaking). They patently contain a significant annuity feature (unless one defines an annuity as a contract necessarily providing fixed-sum pay-

ments),[19] and the granting of annuities has been considered part of the business of life insurance.[20]   Of course, some urge that even the traditional annuity has few "insurance" features and is basically a form of investment. 1. Appleman, Insurance Law and Practice, § 83; *Prudential Ins. Co.* v. *Howell,* 29 N. J. 116, 121–122, 148 A. 2d 145, 148.   But the point is that, even though these contracts contain, for what they are worth, features of traditional annuity contracts, administering them also involves a very substantial and in fact predominant element of the business of an investment company, and that in a way totally foreign to the business of a traditional life insurance and annuity company, as traditionally regulated by state law.   This is what leads to the conclusion that it is not within the intent of the 1933 and 1940 statutes to exempt them.

The individual deferred variable annuity contract of respondent Variable Annuity Life Insurance Company (VALIC) gives a basis for exploration of this.   A sample

---

[19] The important insurance State of Connecticut has.   See *Spellacy* v. *American Life Ins. Assn.,* 144 Conn. 346, 355, 131 A. 2d 834, 839. In any event, these contracts are annuities, "life annuities," in the sense that they provide for payments at periodic intervals for a period measured by a human life or lives, with the payments representing both an income element and a liquidation of contributed capital, with no further return of the investor's capital after the annuity period runs.   Cf. Heubner and Black, *op. cit., supra,* at 99–100.   Of course, there are annuity contracts which provide payments only for terms of years.   See Vance, Insurance (3d ed. 1951), p. 1020.   These have no mortality factor, and, it would appear, no insurance element at all. One of the alternative settlement options under one respondent's policies is a "variable" form of such an arrangement.

[20] State statutes make it clear that the writing of traditional annuities is part of the usual business of life insurance companies. See, *e. g.,* Cal. Insurance Code § 101; Conn. Gen. Stat., 1949, c. 295, § 6144; Smith-Hurd Ill. Ann. Stat., Tit. 73, § 616; N. Y. Insurance Law, §§ 46, 190.   Cf. Huebner and Black, *op. cit., supra,* at 92; Mehr and Osler, Modern Life Insurance (rev. ed. 1956), pp. 69–70.

contract, given in evidence in the District Court, is one issued to a 35-year-old male, providing for his making 30 annual payments of $1,000 each. Of this, $39.60 is the consideration for an undertaking by the company by which payment of the annual $1,000 is waived in the event of disability. Of the remaining $960.40, designated the "basic annuity premium," specified percentages are used to credit to the account of the investor certain "accumulation units." Of the first year's "basic annuity premium," less than 45% is so used; for the next 4 years, the percentage is in the approximate range of 85% to 87%; [21] for years 6 through 10, the figure is 89%, and for the remainder of the 30-year pay-in period it is 92%. Declining term life insurance in a fixed-dollar amount, beginning at five times the annual "basic annuity premium" the first year and declining through a period of 5 years to nil, is provided as a benefit over and above the "accumulation units" credited to the account of the investor.[22] The contract is said to build up a "cash value" as the investor's payment "buys" further accumulation units, but while the value is one which can and would be finally settled by the payment of dollars, the obligation owed by the company to the investor is not one owed to him in dollar terms. It is one which is measured only in terms of "units"—the petitioners suggest a resemblance to "shares"—in a portfolio. The units are established by an

[21] The precise percentages are: first year, 44.79%; second, 85.27%; third, 85.82%; fourth, 86.45%; fifth, 87.17%. The pattern for the second through fifth years would appear to reflect the diminishing cost of declining term insurance sold as part of the contract.

[22] The cost of such insurance, bought separately, would be about 2% of the first 5-years' pay-ins. Longer terms than the 5-year are available. The contract is sold without term life insurance and without waiver of premium on disability to persons who are deemed "uninsurable." The fixed-dollar term insurance and the disability waiver risks of VALIC are heavily reinsured in orthodox insurance companies.

arbitrary computation which has the effect of dividing the company's investment assets as of a starting day into a number of units, and assigning to each unit its share of the over-all market value—though the division is not in fact made.[23]   Then monthly the value of the units is recomputed.   This is done, broadly, by taking into account all interest and dividends paid on the company's portfolio and all realized capital gains and losses, with relevant income taxes, together with all unrealized capital shrinkage and increase, less a monthly surcharge of 0.15% (1.8% per annum) of asset value.[24]   New dollars from investors which "buy" units buy them at the new rate, thus preventing dilution, and those investors who draw down their accumulated units receive cash for them at such rate.[25]

---

[23] Even before there are contract holders, a "unit" is set up in terms of the then value of the company's investment portfolio.   While the number of units credited to investors does not accordingly account for the entire value of the "fund," the value of the units fluctuates as the value of the company's investment portfolio fluctuates in the same fashion as if they were shares in an open-end investment fund.

[24] The surcharge is accounted for in the same way as that part of the premium gross income that does not go toward the crediting of accumulation units.   The analogy is to an annual "management fee" in an investment trust.   Of course, the surcharge is not in fact paid to anyone as a fee for any specific purpose; but to the extent that it is made, a portion of the company's assets is freed from being charged with the valuation of units credited to investors.   To this extent, the company's assets become available for the payment of expenses, for the satisfaction of its obligations in the event the investors as a group outlive their tabular expectancy, and for dividends to common stockholders.

[25] A concrete example of a few years' hypothetical experience during the pay-in period may illustrate the workings of these contracts.   It is based on the specific contract described in the text.

Assume a unit value of $1 at the start of the contract.   The investor's first annual payment of $1,000, less the disability waiver premium and the "loading charge," buys 430 units at the $1 rate.

Assume a favorable year in the company's portfolio's market performance; net capital gains (realized and unrealized) of 15% and

The contract uses insurance terminology .throughout and many of the common features of life insurance and annuity policies are operative in regard to it at this "pay-in" stage. There are "incontestability" and "suicide" clauses (which mainly relate to the term insurance); a "grace period" allowed for the payment of premiums; a provision for "policy loans" (the drawing down of accumulated units in cash, subject to replacement later to·the extent that repayment of the amount of money received will then permit, the transaction bearing a resemblance to the liquidation by a common stock .investor of his holdings in anticipation of a "bear market"); and provision for a ·"cash value" (that is, for the cashing in of the accumulated units, subject to a surrender charge in the early years). And very certainly the commitment of the

---

interest and dividends of 3% of original value, all net of income taxes. On the average asset value at month ends during the year, the 1.8% annual charge would come to about 2% of original value. This would make the value of a unit after a year about $1.16.

Of the second annual premium of $1,000, $819 goes toward buying 706 units at the new rate of $1.16. Thus after the second annual premium, the investor·has 1,136 units to his credit.

Assume a very favorable second year in the market, with net capital gains of 25% of the year's beginning value (29 cents a unit) and income items of 5% of beginning value (about 6 cents a unit), all net of income taxes. The annual charge of 1.8% will come to about 2.4 cents per unit, and the resulting value at year end will be about $1.49 per unit.

Of the third annual premium of $1,000, $824 goes toward buying 553 units at the new rate of $1.49. Thus after the third annual premium, the investor has 1,689 units to his credit.

Assume a bear market the third year, with a 12% net capital shrinkage in the company's portfolio (about 18 cents a unit) and income at 2% of beginning value (3 cents a unit), all net of income taxes. The 1.8% charge would come to about 2.5 cents a unit. These adjustments would give a year end unit value of about $1.31 a unit.

If instead of going on with the contract, the investor then "cashed in his chips," he would get $2,212.59 for his 1,689 units, less a $10 surrender charge.

company eventually to disburse the accumulated values on a life annuity basis once the pay-in period is over is present throughout this period. But what the investor is participating in during this period, despite its acknowledged "insurance" features, is something quite similar to a conventional open-end management investment company, under a periodic investment plan. The investor's cash (less a charge analogous to a loading charge, which is, at least in the early years, very high, but which, it should be said, has to cover annuity premium taxes and some quite conventional mortality risks) goes to buy "units" in a portfolio managed by the persons in control of the corporation. His "units" fluctuate with the income and capital gain and loss experience of the management of the portfolio. He may cash them in, wholly or partially. The amount of his equity is subjected to a charge, on asset value, of 1.8% per annum. Except for the temporary term insurance and the waiver of premium coverage, the entire nature of the company's obligation to its investor during this period is not in dollars (though of course it will be converted into them, just as a commodity transaction can be), but solely in terms of the value of its portfolio. In this sort of operation, examination by state insurance officials to determine the adequacy of reserves and solvency becomes less and less meaningful. The disclosure policy of the Securities Act of 1933 becomes, by comparison, more and more relevant. And the detailed protections of the 1940 legislation—disclosure of investment policy, regulation of changes of that policy, of capital structure, conflicts of interest, investment advisers—all become relevant in an acute way here. These are the basic protections that Congress intended investors to have when they put their money into the hands of an investment trust; there is no adequate substitute for them in the traditional regulatory controls administered by state insurance departments,

because these controls are not relevant to the specific regulatory problems of an investment trust.[26]

The same conclusions follow from a consideration of the next stage of this contract. Before the maturity date, when the schedule of payments in on the contract ceases and the payments out commence, the investor can draw down his "units" in cash, and dispense with all "annuity" features. Failing this, he is entitled to elect one of several annuity alternatives. These are, in the sample policy, a straight life annuity on the life of the investor, a straight life annuity with 10 years' payments certain, and a joint and survivor annuity on the life of the investor and another. Again, while the duration of the company's obligation to pay is independent of its investment experience, the amount of each payment is not a direct money obligation but a function of the status of the company's portfolio. The amounts of the payments are calculated in this fashion: The dollar value of the accumulated units credited to the investor throughout the years is

---

[26] The least-subtle example of the absent protections is that regarding investment policy. The state investment lists are minima; within the limits of the lists, the companies have very broad discretion in making investments, see Mehr and Osler, *op. cit., supra*, at 612, and there appears to be no control at all over their changing their investment policies. The difference in emphasis between the two forms of regulation and the obvious correspondence of the contract in question with an investment trust in this essential regulatory matter hardly needs underscoring.

Even the minimal controls over investment policy furnished by the prescribed lists are administered primarily by one State, the State of incorporation. New York's Insurance Law, § 90, applying in terms the local controls, at least "in substance," to foreign companies doing business within the State, appears the exception rather than the rule. See Vance, *op. cit., supra*, at 43. Other States insist on their own requirements as to part of the assets of a foreign insurance company doing a local business. See Cal. Insurance Code § 1153. Some States explicitly make some deference to the State of incorporation. See Smith-Hurd Ill. Ann. Stat., Tit. 73, § 723 (e).

ascertained. A standard annuity table (including a $3\frac{1}{2}\%$ interest assumption) is used to determine the dollar amount of the first monthly pay-out, based on a capital contribution of the accumulated amount, under the option selected by the investor. The number of "annuity units" (which are functions of the fluctuating asset value of the portfolio of the company) that this amount would buy is computed, and this number of annuity units is paid (transmuted into a varying cash payment) to the investor every subsequent month for the duration of the company's commitment under the option selected. Like that of an "accumulation unit" during the pay-in period, the value in dollars of an "annuity unit" is readjusted monthly to give effect to the investment income of the securities in the company's portfolio for the period, as well as to capital gains and losses, realized and unrealized. Since the first payment (which forms the basis for measurement of the subsequent payments) contains an assumed interest factor, and since the monthly valuation change includes income items—interest and dividends—received in respect of the company's portfolio, to avoid paying double "interest" the $3\frac{1}{2}\%$ assumed interest factor is wrung out every month by multiplying the preceding month's valuation by 0.9971.[27] And the 1.8% annual surcharge on asset value is applied also.[28]

---

[27] The reciprocal of 1.000 plus monthly interest at the rate of $3\frac{1}{2}\%$ per annum.

[28] A concrete hypothetical example of the workings of the contract in the pay-out period may be useful. Assume that the investor described in the text and in footnote 25 did not cash in his contract, but kept it during the entire 30-year pay-in period. Assume that he has accumulated, through premium-payment "purchases" at varying prices throughout the years, 14,000 units and that the value of a unit has mounted to $3 over the years. The investor can now take his $42,000 in cash, if he chooses. But let us assume that he is healthy and without dependents, so that he is moved to elect the option of a straight life annuity. This capital contribution of $42,000 by a 65-

The effect of this is that the investor, during the pay-out period, is in almost every way as much a participant in something equivalent to an investment trust as before. His monthly payment is not really a dollar payment, though it is converted into dollars before it is paid to him; it is a payment in terms of a portfolio of securities. It is true that the company has a fixed obligation to continue payments, and that the duration and the amount of the payments are not affected by collective longevity in excess of the company's assumptions; the company's obligation to continue payments is not limited in any way by reference to the number of units owned by all the investors

---

year-old male would buy a fixed-dollar annuity of $286 a month. This is in fact what our investor will get the first month. But this first monthly payment will be used to fix the number of annuity units he will receive monthy for the rest of his life.

Assume that the value at this time of an annuity unit is $2. (While the value of an annuity unit tends to move in the same direction as the value of an accumulation unit, it differs from it because every month it is multiplied by 0.9971 to "wring out" the assumed interest factor in the annuity table. So over the years, the current values of the two sorts of units will drift apart, even though they move the same way with the fluctuations of the company's portfolio.) At the $2 rate, the first monthly payment is 143 units, and this number of units will be paid the investor monthly for life.

Assume that there is a sharp break in the market during the first month of the pay-out period. (Actually, there is a one-month lag in computation, but for the purposes of demonstration this can be ignored.) Suppose this market break shrinks the capital value of the company's portfolio by 8% (16 cents a unit). Assume income items during the month at 3% per annum (0.5 cents). Then deduct the omnipresent 1.8% annual charge (0.3 cents). This puts the current value at $1.842; the 0.9971 multiplier must be applied to wring out the interest assumption in the annuity table. This gives an adjusted value of $1.8367. The investor is then paid, for his second monthly payment, 143 units at this new rate, or $262.65.

The recomputation of the unit value takes place monthly, and every month the investor is paid 143 units at the new rate; whatever this may come to in dollars.

at the start of their annuity periods. If the lives of the group of investors exceed the longevity assumptions of the table, the proceeds of what might otherwise have been characterized as a very high "loading charge" (8% at its lowest application, with 11% the minimum for the first 10 years) and a substantial "annual management fee" (1.8% of asset value annually) will have to provide, with the company's other surplus and capital, enough to continue payments. But the individual payment is still a payment measured basically in the same way as one's interest in an investment trust is measured. And in a very real sense the investor is more vitally interested in the investment experience of the company at this period than he ever was in the pay-in period, and in a way more vitally than any holder of an open-end investment company certificate, or share in a publicly traded closed-end company ever is: he has become completely "locked in." He obviously cannot draw down the present value of his "units" once the option to receive annuity payments has been exercised; he cannot "cash in his chips" that he bought in the faith of the management of the fund; his rights are technically assignable, but practically unmarketable since they depend on his individual life span. The company can radically change investment policies, change advisers, do whatever it pleases (so long as it does not run afoul of the minimal investment regulations of the State), and there is nothing the contract holder can do about it. It is not rational to say that Congress abandoned the very appropriate protections of the Investment Company Act in this investor's case in favor of provisions of state regulation that are quite irrelevant to the basic problems of protecting him.

The respondents seek to equate this contract with a fixed-dollar "participating" annuity sold by a mutual company, or one sold by a stock company on a participating basis. This contention is not persuasive. While

investment experience in a "participating" contract can redound to the benefit of the policyholder, the contracts are sold as fixed-dollar obligations. The "dividends" are promoted as such. During the pay-in period, they might be thought of as a reduction of premium.[29] They may very well represent favorable mortality risk experience, particularly where the company's investments are conservative. And the annuity-paying insurance company's investments are doubtless administered in the light of the fixed obligation of the company. The company is not committed by its literature to perform part of the job of a common-stock investment trust.[30] No one has yet tried to follow the academic suggestion of respondent VALIC, and reduce the fixed guarantee of a traditional life annuity to the point of insignificance and make the rest of the return to the contract holder variable, by selling it on a "participating" basis.[31] The comparison of the premium cost of such a contract to its fixed return might well make it unsalable to the public. Even more unpersuasive is the respondents' argument that even in a traditional annuity the policyholder bears the investment risk in the sense that he sta the risk of the company's insolvency. The prevention of in-

---

[29] See Mehr and Osler, *op. cit., supra,* at 583; cf. *Fuller* v. *Metropolitan Life Ins. Co.,* 70 Conn. 647, 666, 41 A. 4, 11.

[30] In the traditional form of insurance, the appreciation potential of common stocks is said not to be the predominant reason for an insurer's investing in them. While many States allow investment in them in varying degrees, commentators emphasize that the purpose of such investment is primarily diversification of investment; in certain industries, common stock may be the only sort of available investment. Huebner and Black, *op. cit., supra,* at 505. Of course, the primary investment aim of the traditional insurer is preservation of dollar capital with income. *Id.,* at 507.

[31] VALIC's hypothetical is an annuity based on an investment return of $\frac{1}{2}\%$ per annum and an average mortality at 110 years.

solvency and the maintenance of "sound" financial condition in terms of fixed-dollar obligations is precisely what traditional state regulation is aimed at. The protection of share interests in a fluctuating, managed fund has received the attention of specific federal legislation. Both are "investment risks" in a sense, but they differ vastly in kind and lend themselves to different regulatory schemes.

Accordingly, while these contracts contain insurance features, they contain to a very substantial degree elements of investment contracts as administered by equity investment trusts. They contain these elements in a way different in kind from the way that insurance and annuity policies did when Congress wrote the exemptions for them in the 1933 Act and the 1940 Act. Since Congress was intending a broad coverage in both these remedial Acts and since these contracts present regulatory problems of the very sort that Congress was attempting to solve by them, I conclude that Congress did not intend to exclude contracts like these by reason of the "insurance" exemptions.

*Third.* The respondents contend that a reversal of the judgment will put them out of business. The reason given is that if the Investment Company Act of 1940 applies to them, they are probably categorizable under it as open-end management companies,[32] and it is

---

[32] According to § 5, " 'Open-end company' means a management company [*i. e.*, an investment company other than a unit investment trust or a face-amount certificate company, § 4] which is offering for sale or has outstanding any redeemable security of which it is the issuer." The redeemability of these contracts during the pay-in period would appear to make their issuer come under this definition. Even if the companies were considered closed-end companies, they argue that other provisions of § 18 would pose very difficult problems for them. See § 18 (a).

declared unlawful by § 18 of the Act for an open-end company to have outstanding any "senior security," that is, any security senior to any other class of securities. These companies have capital stock, and the contracts in question would be securities senior to the stock.[33] If one assumes that this is correct, there is of course the possibility that the SEC might use its broad dispensing powers in this regard, and, in any event, the whole point would be of no concern at all if the contracts in question were issued by mutual companies.[34] But in the final analysis, it is not decisive of the issues here that a holding that these con-

---

[33.] The companies say that this is because their contracts are debt obligations. It is quite doubtful whether the contracts can be described as debts; certainly they are not much more of a debt than a redeemable share in an orthodox open-end company is; here the redemption feature is expressed in outright redeemability during the pay-in period and in liquidation on an annuity basis in the pay-out period. But in any event, whether the contracts are debts or not, they have priority over the companies' stock, and the provisions dealing with senior securities would appear to cover them.

[34] The most basic purpose of the provision might be viewed by the SEC as the protection, in the case of the traditional open-end company, of the investment certificate holders from the creation of securities senior to their interests (as well as preventing, in the interest of their purchasers, the creation of a class of "senior" securities which would be senior only to freely redeemable junior securities). Since it is the senior securities here which are the analogs of open-end investment trust certificates, quite the contrary situation might be thought to be presented. The SEC's dispensing authority in regard to the Investment Company Act is found in § 6 (c), which provides: "The Commission, by rules and regulations upon its own motion, or by order upon application, may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this title or of any rule or regulation thereunder, if and to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of this title."

tracts are subject to the Federal Acts might require some modification in the business of issuing them. Since these contracts are in fact covered by the Acts, there can be no reason why their issuers should be able to carry on the investment business in a way which Congress has forbidden.

Similarly, it may be conceded freely that this form of investment contract may be one of great potential benefit to the public. So, of course, may be orthodox open-end investment trusts, and they clearly are regulated by federal law. In short, notions that this form of arrangement is a desirable one and that it might be well to allow it to exist for a while immune from federal regulation are not relevant to the matter for decision. Congress regulates by general statutes. The passage of a federal regulatory statute is a delicate balancing of many national legislative interests and political forces. Congress need not go through the initial travail of re-enacting its general regulatory scheme every time a new form of enterprise is introduced, if that new form falls within the scheme's coverage. If there is deemed wise any adjustment of the regulatory scheme in the light of new developments in the subject matter to which it extends, Congress may make it.

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER, MR. JUSTICE CLARK and MR. JUSTICE WHITTAKER join, dissenting.

The issue in these cases is whether Variable Annuity Life Insurance Company of America (VALIC) and The Equity Annuity Life Insurance Company (EALIC) are subject to regulation by the Securities and Exchange Commission under the Securities Act of 1933 and the Investment Company Act of 1940 with respect to their variable annuity business.

Section 3 (a) (8) of the Securities Act, 48 Stat. 74, 76, 15 U. S. C. §-77c (a) (8), provides that the statute shall not apply to:-

"Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia."

Section 3 (c) (3) of the Investment Company Act, 54 Stat. 789, 798, 15 U. S. C. § 80a–3 (c) (3), puts outside the coverage of the Act "[a]ny . . . insurance company," and § 2 (a) (17), 54 Stat. 789, 793, 15 U. S. C. § 80a–2 (a) (17), defines an insurance company as:

"a company which is organized as an insurance company, whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies, and which is subject to supervision by the insurance commissioner or a similar official or agency of a State; or any receiver or similar official or any liquidating agent for such a company, in his capacity as such."

These two insurance companies are organized under the Life Insurance Act of the District of Columbia, 35 D. C. Code, 1951, §§ 35–301 to 35–803, and are subject to regulation by the Superintendent of Insurance of the District of Columbia, who has approved the annuity policies written by them. At the time of trial VALIC had also qualified to do business in Arkansas, Kentucky, and West Virginia, and its annuity policies had likewise been approved by the insurance departments of those States.[1] Both companies in the District of Columbia,

---

[1] Since the trial VALIC has also qualified in Alabama and New Mexico, and EALIC in North Dakota.

and VALIC in the other States, offer their policies to the public only through insurance agents duly licensed by the local insurance authority.

Variable annuity policies are a recent development in the insurance business designed to meet inflationary trends in the economy by substituting for annuity payments in fixed-dollar amounts payments in fluctuating amounts, measured ultimately by the company's success in investing the premium payments received from annuitants. One of the early pioneers in this field was Teachers Insurance and Annuity Association, a New York regulated life insurance organization engaged in selling annuities to college personnel. The Association in 1950 made exhaustive studies into the feasibility and soundness of variable annuities. Two years later, it incorporated College Retirement Equities Fund, a companion company under joint management with Teachers Insurance, which, subject to regulation under the New York Insurance Law, commenced offering such annuity contracts in the teaching profession.[2] The first life insurance company to offer such contracts generally appears to have been the Participating Annuity Life Insurance Company, which since 1954 has been selling variable annuity policies under the supervision of the Arkansas insurance authorities. VALIC and EALIC entered the field in 1955 and 1956 respectively.

The characteristics of a typical variable annuity contract have been adumbrated by the majority. It is sufficient to note here that, as the majority concludes, as the two lower courts found, and as the SEC itself recognizes, it may fairly be said that variable annuity contracts contain both "insurance" and "securities" features. It is

---

[2] By the end of 1956 the College Retirement Fund had issued such annuities to more than 31,000 individuals, and the value of its annuity units had increased from $10 to $18.51.

certainly beyond question that the "mortality" aspect of
these annuities—that is the assumption by the company
of the entire risk of longevity—involves nothing other
than classic insurance concepts and procedures, and I do
not understand how that feature can be said to be "not
substantial," determining as it does, apart from options,
the commencement and duration of annuity payments to
the policyholder.   On the other hand it cannot be denied
that the investment policies underlying these annuities,
and the stake of the annuitants in their success or failure,
place the insurance company in a position closely
resembling that of a company issuing certificates in a
periodic payment investment plan.   Even so, analysis by
fragmentization is at best a hazardous business, and in
this instance has, in my opinion, led the Court to unsound
legal conclusions.   It is important to keep in mind that
these are not cases where the label "annuity" has simply
been attached to a securities scheme, or where the offering
companies are traveling under false colors, in an effort
to avoid federal regulation.   The *bona fides* of this new
development in the field of insurance is beyond dispute.

The Court's holding that these two companies are sub-
ject to SEC regulation stems from its preoccupation with
a constricted "color matching" approach to the construc-
tion of the relevant federal statutes which fails to take
adequate account of the historic congressional policy of
leaving regulation of the business of insurance entirely
to the States.   It would be carrying coals to Newcastle to
re-examine here the history of that policy which was fully
canvassed in the several opinions of the Justices in *United
States* v. *South-Eastern Underwriters Assn.*, 322 U. S.
533, and which was again implicitly recognized by this
Court as recently as last Term when, in *Federal Trade
Comm'n* v. *National Casualty Co.*, 357 U. S. 560, we
declined to give a niggardly construction to the McCarran

Act. Suffice it to say that in consequence of this Court's decision 90 years ago in *Paul* v. *Virginia*, 8 Wall. 168, and the many cases following it,[3] there had come to be "widespread doubt" prior to the time the Securities and Investment Company Acts were passed "that the Federal Government could enter the field [of insurance regulation] at all." *Wilburn Boat Co.* v. *Fireman's Fund Ins. Co.*, 348 U. S. 310, 318; see also *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408, 414.

I can find nothing in the history of the Securities Act of 1933 which savors in the slightest degree of a purpose to depart from or dilute this traditional federal "hands off" policy respecting insurance regulation. On the contrary, the exemption of insurance from that Act, which is couched in the broadest terms, reflected not merely adherence to tradition but also compliance with a supposed command of the Constitution. In a study of the proposed Act, the Department of Commerce concluded that the legislation could be bottomed on the federal power over commerce because securities did have the independent general commercial existence and value which the *Paul* decision had found lacking in insurance policies. See A Study of the Economic and Legal Aspects of the Proposed Federal Securities Act, reprinted in Hearings before Senate Committee on Banking and Currency on S. 875, 73d Cong., 1st Sess. 312, at 330, and in Hearings before House Committee on Interstate and Foreign Commerce on H. R. 4314, 73d Cong., 1st Sess. 87, at 105. This distinction between securities and insurance, mistaken or not, underlay the passage of the final bill. When the proposed act was considered by the Senate and House Committees, it did not contain an express exemption of

---

[3] The cases are collected in *United States* v. *South-Eastern Underwriters Assn., supra*, at 544, n. 18.

insurance. The House Committee explained that the exemption in the final bill (§ 3 (a)(8) of the Act):

> "makes clear what is already implied in the act, namely, that insurance policies are not to be regarded as securities subject to the provisions of the act. The insurance policy and like contracts are not regarded in the commercial world as securities offered to the public for investment purposes. The entire tenor of the act would lead, even without this specific exemption, to the exclusion of insurance policies from the provisions of the act, but the specific exemption is included to make misinterpretation impossible." H. R. Rep. No. 85, 73d Cong., 1st Sess. 15.

That this distinction stemmed from the feared implications of the *Paul* decision appears from the House debates. See 73d Cong., 1st Sess., 77 Cong. Rec. 2936, 2937, 2938, 2946. Moreover, two days after the Senate began consideration of the proposed act, Senator Robinson introduced a resolution (S. J. Res. 51) calling for a constitutional amendment because, in his view, "the National Government at present has no authority whatever over insurance companies." 73d Cong., 1st Sess., 77 Cong. Rec. 3109.

Similarly, I can find nothing in the history of the Investment Company Act of 1940 which points in any way to a change in federal policy on this score. Here tradition, perhaps more than constitutional doubt, explains the exemption of insurance companies from the Act. In hearings before the House Committee, Commissioner Healy of the SEC discussed the "face-amount installment certificates" issued by certain investment companies and often "sold on the basis of the comparison with savings bank deposits and insurance policies." The major factor appearing to distinguish these investment

companies from insurance companies for purposes of federal control was the strict state regulation present over insurance policies but absent over investment certificates. Hearings before House Committee on Interstate and Foreign Commerce on H. R. 10065, 76th Cong., 3d Sess. 61–62. Likewise, in the Senate debates, preservation of state regulation over insurance companies appears as the crucial factor distinguishing them from investment trusts. 76th Cong., 3d Sess., 86 Cong. Rec. 10070. Stating that "the bill has nothing to do with the regulation of insurance companies," Senator Byrnes went on to say: "The platforms of both political parties have urged supervision of insurance by the several States, but not regulation by the Federal Government." *Id.,* at 10071. See also *United States* v. *South-Eastern Underwriters Assn., supra,* at 584, 591–592, n. 12 (dissenting opinion).

In 1944, this Court removed the supposed constitutional basis for exemption of insurance by holding, in *United States* v. *South-Eastern Underwriters Assn., supra,* that the business of insurance was subject to federal regulation under the commerce power. Congress was quick to respond. It forthwith enacted the McCarran Act, 59 Stat. 33, 15 U. S. C. §§ 1011–1015, which on its face demonstrates the purpose "broadly to give support to the existing and future state systems for regulating and taxing the business of insurance," *Prudential Ins. Co.* v. *Benjamin, supra,* at 429, and "to assure that existing state power to regulate insurance would continue." *Wilburn Boat Co.* v. *Fireman's Fund Ins. Co., supra,* at 319. Thus, rather than encouraging Congress to enter the field of insurance, the *South-Eastern* decision spurred reiteration of its undeviating policy of abstention.

In this framework of history the course for us in these cases seems to me plain. We should decline to admit the SEC into this traditionally state regulatory domain.

Admittedly the variable annuity was not in the picture when the Securities and Investment Company Acts were passed. It is a new development combining both substantial insurance and securities features in an experiment designed to accommodate annuity insurance coverage to contingencies of the present day economic climate.[4] This, however, should not be allowed to obscure the fact that Congress intended when it enacted these statutes to leave the future regulation of the business of insurance wholly with the States. This intent, repeatedly expressed in a history of which the Securities and Investment Company Acts were only a part, in my view demands that *bona fide* experiments in the insurance field, even though a particular development may also have securities aspects, be classed within the federal exemption of insurance, and not within the federal regulation of securities.[5] Certainly these statutes breathe no notion of concurrent regulation by the SEC and state insurance authorities. The fact that they do not serves to reinforce the view that the congressional exemption of insurance was but another manifestation of the historic federal policy leaving regulation of the business of insurance exclusively to the States.[6]

It is asserted that state regulation, as it existed when the Securities and Investment Company Acts were passed,

---

[4] See Morrissey, Dispute Over the Variable Annuity, 35 Harv. Bus. Rev. 75 (1957).

[5] *It is worth observing that in reporting the proposed Securities Act of 1933 the House Committee stated that insurance policies "and like contracts" were to be exempt from federal regulation. See ante, p. 98.*

[6] In contrast, § 18 of the Securities Act, 48 Stat. 74, 85, 15 U. S. C. § 77r, provides that the Act shall not affect the jurisdiction of state securities commissions, thus recognizing a system of dual regulation where the exemptive provisions are not applicable. The Investment Company Act has a similar provision, § 50. 54 Stat. 789, 846, 15 U. S. C. § 80a–49.

was inadequate to protect annuitants against the risks inherent in the variable annuity and that therefore such contracts should be considered within the orbit of SEC regulation. The Court is agreed that we should not "freeze" the concept of insurance as it then existed. By the same token we should not proceed on the assumption that the thrust of state regulation is frozen. As the insurance business develops new concepts the States adjust and develop their controls. This is in the tradition of state regulation and federal abstention. If the innovation of federal control is nevertheless to be desired, it is for the Congress, not this Court, to effect.

I would affirm.